## CALIFORNIA REDUCTION COMPANY *v.* SANITARY REDUCTION WORKS.

### CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 25. Argued October 26, 27, 1905.—Decided November 27, 1905.

The Board of Supervisors of the city and county of San Francisco have full authority under the constitution and laws of the State of California to make and enforce within that city and county all such reasonable sanitary and other regulations as are not in conflict with any general statute or with the constitution, and which have for their object the preservation of the public health by whatever cause endangered.

Where the power of the authorities to grant privileges to be exercised for public benefit is not limited by law in that respect the duration of the period for which the privilege is granted is a matter in their discretion to be determined on grounds of public policy, and, even if such privileges ought not be granted for long periods, the courts cannot declare a grant void merely on that ground.

Where a regulation enacted by competent public authority for the protection of the public health has a real, substantial relation to that object the courts will not strike it down on grounds of public policy or expediency.

Where the basis of the claim is that an ordinance is unconstitutional as taking private property for public use without compensation, the claim must be made by one whose property is taken, and it cannot be raised on his behalf by others whose property is not taken.

An ordinance of competent municipal authorities based upon reasonable grounds for the cremation of garbage and refuse at a designated place as a means for the protection of the public health is not a taking of private property for public use without compensation within the meaning of the Federal Constitution even though such garbage and refuse may have some elements of value for certain purposes.

The exclusive privilege granted to one company by the Board of Supervisors of San Francisco to dispose of the garbage in the city and county of San Francisco *held* not to be void as taking the property of householders for public use without compensation.

THE Board of Supervisors of the city and county of San Francisco, by ordinance adopted February 17, 1896, and known

as Order No. 2965, granted to F. E. Sharon, his associates and assigns, the sole and exclusive right and privilege, for a term of fifty years, to cremate and destroy within that city and county, by crematories or by a process of reduction, house refuse, dirt, ashes, cinders, sludge, crockery, tins, bones and other like matter, dead animals (not provided for by contract or franchise theretofore granted), putrid vegetable matter, fish, flesh and food condemned by the Board of Health of the city and county as unfit for human food—the grantees, their associates and assigns, having the right to charge and collect therefor not exceeding the sum of twenty cents per load.

The grantees, their associates and assigns, were required to have in operation, within two years after the granting of the above privilege or franchise, a suitable building or buildings, with necessary crematories, machinery, tools and appliances necessary to cremate and destroy by cremation, or by a process of reduction, all obnoxious germs and elements contained in house refuse, and other substances above mentioned —the works to be such as would suffice for the cremation or reduction of at least three hundred tons per day of such substances.

By the same ordinance it was made unlawful, after erection of such works, for any person or corporation to remove through the public streets from any houses, hotels, markets, hospitals, factories, restaurants, stores or other like building or place, in the city and county, any of the substances above specified, except in closed vehicles and wagons constructed so as to conceal the contents from public view, and to effectually prevent any smell escaping therefrom, as well as to prevent the dropping of any portion of such material or substances on the public streets—such vehicles and wagons to be constructed in accordance with specifications approved by the Board of Health of the city and county.

The ordinance also made it unlawful, after the buildings referred to had been constructed, for any person or corporation

to dump or place upon any land, water or waterways within the city and county, any such substances, and required that they should be forthwith delivered to the above crematory, "and there, at the expense of the person or corporation so conveying the same, be cremated or destroyed or subjected to such disposition and treatment as will at once secure and effect a complete combustion of all gases and odors arising therefrom."

The grantees, their associates and assigns, were required, within twenty-four hours after receiving any of the material or substances above specified, to "cremate or reduce the same, or subject the same to such process as will secure the complete combustion of all gases or odors arising therefrom," and to maintain and operate their plant and crematories, or other apparatus, "so as to prevent any obnoxious smells or gases being emitted either from the deposits of such matter or substances on their premises, or from the process of cremation or other treatment thereof, or from the residuum remaining after cremation or treatment as aforesaid; also, that in the operation of said works no smoke or soot shall be emitted so as to constitute a nuisance."

The ordinance further provided that the grantees, their associates and assigns, should, from and after December 1, 1902, have the sole and exclusive right and privilege, during the remainder of the term of their franchise, "to remove and dispose of all dogs killed at the public pound, and all animals impounded and not redeemed by the owners thereof, and which are valueless and cannot be sold; also, to remove and dispose of the carcasses of all dead animals in said city and county not slain for human food, which shall not be removed and disposed of by the owners thereof, so as not to become a nuisance, within six hours after the death of the same."

It was further provided that the grantees, their associates and assigns, should be subject to all health and sanitary regulations in force during the existence of said franchises; and should receive no compensation whatever from the city and

county for services performed by them in disposing of the specified material and substances.

For the privileges or franchise granted by this ordinance, Sharon and his associates paid the sum of twenty-five hundred and ten dollars in cash, and stipulated to pay for fifteen years two per centum, and for the remaining term of thirty-five years five per centum, of the gross amount of their receipts from the business.

The Sanitary Reduction Works, a corporation of California, became the assignee and successor in interest of the franchise or privileges granted to Sharon, his associates and assigns, and notified the Board of Supervisors of the completion of their works and of their readiness to receive, cremate and destroy all such substances as were specified in Order No. 2965. The cost of such works, the present plaintiff alleged, exceeded the sum of $200,000.

Thereupon the Board of Supervisors, on November 1, 1897, adopted Order No. 12 (Second Series), which provided that no person, company or corporation should, on or after November 8, 1897, deposit, dump or cause to be dumped or deposited upon any street, lot, land, water or waterways within the city and county, or from any wharf or bulkhead on the water front of the city and county, any of the above substances or material, and that all such substances or matter should be delivered at and to. the crematory of the Sanitary Reduction Works, "and there, at the expense of the person, company or corporation so conveying the same, be cremated and destroyed or subjected to such disposition and treatment as will secure and effect a complete combustion of all gases and odors arising therefrom." Any violation of that order was declared to be a misdemeanor, punishable by a fine of not exceeding two hundred and fifty dollars, or by imprisonment for a term not exceeding one hundred days, or by both such fine and imprisonment.

The present suit was brought by the Sanitary Reduction Company against the California Reduction Company, and about one hundred and fifty individuals.

The defendant corporation was organized under the laws of Colorado, at the instance of certain citizens of California, for the purpose, we may assume from the record, of removing, by boats and barges, large quantities of the material and substances specified in the orders of the Board of Supervisors from the city and county of San Francisco and depositing them on lands in the county of San Mateo and elsewhere than at the works of the Sanitary Reduction Company, thereby preventing the same from being delivered to and incinerated and destroyed by the latter company under its contract with the city and county of San Francisco.

The individual defendants are subjects of the Kingdom of Italy, and owners of licensed wagons used in their calling as scavengers in the city and county of San Francisco. It seems that a very few of them, not more than about half a dozen, are householders in that city and county.

Between the California Reduction Company and the individual defendants there is a written agreement, dated November 22, 1898, requiring the former, within thirty days thereafter, to provide one or more suitable buildings, wharves or other places, for the reception from the latter, "of all garbage, ashes, refuse, butchers' offal, dirt, sludge, crockery, tins or other like matter, or any putrid animal or vegetable matter, or any fish, flesh or food, or any dead animals; which said buildings, wharves or other place or places shall be so located that the average travel to the same shall not exceed the average haul to the Sanitary Reduction Works by more than a quarter of a mile." By that agreement the individual defendants bound themselves to deliver at the buildings or places provided by the defendant corporation all such material or substances gathered by them from time to time in the city and county. The individual defendants also stipulated in the agreement that they would not deliver any of the above material or substances to any other party than the California Reduction Company, nor at any other place than the one designated and chosen by that company.

The pleadings and the evidence in the cause show that the defendants had entered upon the execution of their agreement and the transaction of the business to which it related. No question is made as to the right of the plaintiff to exercise whatever privileges had been legally granted to Sharon, his associates and assigns.

The object of the suit by the plaintiff corporation was to obtain a decree restraining the defendants, by injunction, from removing from the city and county of San Francisco, or depositing or dumping at any other place than at the works of the plaintiff, any of the garbage or other materials specified in the orders of the Board of Supervisors, or from infringing, directly or indirectly, the exclusive rights, privileges and franchises secured to the plaintiff as above stated.

The Circuit Court, Judge Morrow presiding, passed a decree giving the relief asked. 94 Fed. Rep. 693. That decree was affirmed in the Circuit Court of Appeals, Judge Hawley delivering the opinion of the court. 126 Fed. Rep. 29.

*Mr. R. T. Harding*, with whom *Mr. Garret W. McEnerney, Mr. Charles Page* and *Mr. Edward J. McCutchen* were on the brief, for petitioners:

Considered either as a franchise or a contract under the police power, the ordinance here involved is a violation of the Fourteenth Amendment of the Constitution of the United States, for the reason that for a period of fifty years it deprives the householders of San Francisco of property of commercial value by transferring that property to the respondent, and this without requiring compensation to be made.

For fifty years all property in the substances named is required to be surrendered by the inhabitants of San Francisco to the complainant; and the householder must pay twenty cents per cubic yard for the reduction of the property surrendered. It cannot be claimed that the articles required to be surrendered have no value. A number of the substances mentioned are not only of value, but they have a commercial

value and are subjects of quotation in the daily fluctuating market reports, as, for instance, bones, broken crockery and tins. It is likewise true of house refuse as distinguished from garbage. See *Alpers* v. *San Francisco*, 32 Fed. Rep. 506, as to value of dead animals.

Under these circumstances the ordinance is a substantial violation of the Fourteenth Amendment. *State* v. *Robbins*, 124 Indiana, 308.

Ordinances like this are unconstitutional because they involve a confiscation of property. *Meyer* v. *Jones*, 49 S. W. Rep. (Ky.) 809; *Iler* v. *Ross*, 90 N. W. Rep. (Neb.) 961; *Rendering Co.* v. *Behr*, 77 Missouri, 91; *Knauer* v. *Louisville*, 45 S. W. Rep. 510; *State* v. *Morris*, 47 La. Ann. 1664; *Underwood* v. *Green*, 42 N. Y. 140; *Schoen* v. *Atlanta*, 97 Georgia, 697; *Gregory* v. *Mayor*, 40 N. Y. 273.

Conceding the ordinance to be otherwise constitutional, it is nevertheless invalid, because there is no authority of law for requiring householders to pay twenty cents per cubic yard for the reduction of the substances taken from them and given to the respondent by the ordinance. *Slaughter House Cases*, 16 Wall. 36, do not sustain this charge and *Walker* v. *Jamieson*, 140 Indiana, 591, can be distinguished:

Considered either as a contract under the police power or as a franchise, the ordinance here involved never had any legal existence, for the reason that it was never lawfully enacted.

Considered as a franchise, the ordinance is invalid for want of power to grant it and for a violation of the prescribed mode in the granting thereof, if there were power to grant it.

There is no law of California under which the ordinance, considered as a franchise, could have been lawfully granted. The ordinance itself purports to have been granted solely under the authority contained in the franchise act of 1893, Stats. Cal., 1893, p. 298, which does not pretend to authorize the granting of franchises. *Minturn* v. *La Rue*, 23 How. 435; *Street Railway* v. *Detroit Railway*, 171 U. S. 48.

The grant of the franchise was invalid for the reason

that it was not sold to the highest bidder, as required by the act of 1893. *Zanesville* v. *Gas Company*, 47 Ohio St. 1; Thompson on Corp. § 5340; *Waterloo Road Co.* v. *Cole*, 51 California, 386.

Assuming, however, that the act of 1893 does authorize the granting of such a franchise, there is no provision therein or elsewhere which authorizes the granting of an *exclusive* franchise.

Socialism has not become so dominant a principle in the police power that the State can assume or farm out a monopoly of all of the occupations subject to regulation under the police power. *Iler* v. *Ross*, 64 Nebraska, 710.

To justify the exercise of the police power the public interest must require the interference, and the measures adopted must be reasonably necessary for the accomplishment of the purpose. *Lawton* v. *Steele*, 152 U. S. 133; *Allgeyer* v. *Louisiana*, 165 U. S. 578.

*Mr. Aldis B. Browne,* with whom *Mr. C. L. Tilden, Mr. Sheldon G. Kellogg* and *Mr. Alexander Britton* were on the brief, for respondent:

The orders are valid under the police power vested in the city and county of San Francisco. *Slaughter House Cases,* 16 Wall. 36, 62; *H. & St. J. R. Co.* v. *Husen,* 95 U. S. 465; *Lawton* v. *Steele,* 152 U. S. 133; *Dupont* v. *District of Columbia,* 20 App. D. C. 477, 487; Dillon, Mun. Corp. § 141; *Harrington* v. *Providence,* 20 R. I. 235; *Ex parte Tuttle,* 91 California, 589; *Ex parte Lacey,* 108 California, 326; *New York* v. *Moeschen,* 72 N. E. Rep. (N. Y.) 231.

In the city and county of San Francisco the Board of Supervisors was, and is, the body or board which formed the legislative department of the government of that municipality. *McDonald* v. *Dodge,* 97 California, 112, 114; *Harrison* v. *Roberts,* 78 Pac. Rep. 537, 540. And as such was entrusted with the exercise of the police power therein. Const., California, Art. XI, § 11.

As to act of 1863 see *Ex parte Schrader*, 33 California, 279, and the right of the State to delegate police power to the city so far as necessary to protect the health of the inhabitants. *Norfolk* v. *Flynn*, 101 Virginia, 473.

As to *Iler* v. *Ross*, 64 Nebraska, 710, and other cases cited by petitioner, see *Smiley* v. *McDonald*, 42 Nebraska, 5; *Coombs* v. *McDonald*, 43 Nebraska, 632; *State* v. *Paysson*, 47 La. Ann. 1029. As to dead animal contracts see *Alpers* v. *San Francisco*, 32 Fed. Rep. 503; *Fertilizer Co.* v. *Lambert*, 48 Fed. Rep. 458. See also following cases relating to garbage contracts and ordinances. *Walker* v. *Jameson*, 140 Indiana, 591; *Grand Rapids* v. *De Vries*, 123 Michigan, 570; *Dupont* v. *Dist. of Col.*, 20 App. D. C. 477; *People* v. *Gardner*, 100 N. W. Rep. (Mich.) 126; *State* v. *Orr*, 68 Connecticut, 101, 110; *Ex parte Casinello*, 62 California, 538; *Kilvington* v. *Superior*, 83 Wisconsin, 222, 226; *People* v. *Gordon*, 81 Michigan, 570.

The orders are not invalid because they confer an exclusive privilege. *Slaughter House Cases*, 16 Wall. 36, 66. It was necessary to grant an exclusive privilege in order to have the work properly done. For exclusive garbage and dead animal contracts upheld see cases cited *supra* and *re Vandine*, 6 Pick. 187; *Louisville* v. *Wible*, 84 Kentucky, 290, 295. A similar rule applied as to text books. *Bancroft* v. *Thayer*, 5 Sawyer, 502; *Dickinson* v. *Cunningham*, 37 So. Rep. (Ala.) 345; *Lupes* v. *State*, 103 Tennessee, 500; Cooley, Const. Lim., 5th ed., 225. note.

The ordinances are not invalid as taking private property without compensation. The material has no value when gathered by scavengers and has no value until considerable expense and outlay shall have been incurred. That these ordinances do not violate property rights see *People* v. *Gardner*, 100 N. W. Rep. (Mich.) 126; *Dupont* v. *Dist. of Col.*, 20 App. D. C. 477; *Fertilizer Co.* v. *Lambert*, 48 Fed. Rep. 458 *State* v. *Orr*, 68 Connecticut, 101; *Harrington* v. *Providence*, 20 R. I. 235; *Baker* v. *Brown*, 12 Pick. 183, 193. And also in this court. *Lawton* v. *Steele*, 152 U. S. 133; *Mugler* v. *Kan-*

*sas,* 123 U. S. 623, 661; *Powell* v. *Pennsylvania,* 127 U. S. 678, 685; *Barbier* v. *Connolly,* 113 U. S. 27; *C., B. & Q. R. R. Co.* v. *Chicago,* 166 U. S. 226, 255; *Norfolk* v. *Flynn,* 101 Virginia, 473; *Morgan S. S. Co.* v. *Louisiana,* 118 U. S. 455. The cases already cited hold that it was within the discretion of the municipality to grant a term of fifty years.

A municipality has the same right to exercise the police power in matters within its jurisdiction as the State. *Slaughter House Cases* and *Louisville* v. *Wible, supra;* see also *Barbier* v. *Connolly,* 113 U. S. 27; *Yick Wo* v. *Hopkins,* 118 U. S. 370; *Ex parte Lacey,* 108 California, 326; *Ex parte Tuttle,* 91 California, 589; *Ex parte Schraeder,* 33 California, 279, 284.

The orders do not interfere with the occupation of scavengers. See *Iler* v. *Ross* and *Grand Rapids* v. *De Vries, supra; Rendering Co.* v. *Behr,* 7 Mo. App. 345, 582.

The charges authorized to be made upon those delivering garbage do not make the orders invalid. *Raymond* v. *Fish,* 51 Connecticut, 80, 96; *King* v. *Davenport,* 98 Illinois, 305; *Walker* v. *Jameson,* 140 Indiana, 591; *Meyer* v. *Jones,* 20 Ky. Law Rep. 1632; *Smiley* v. *McDonald,* 42 Nebraska, 5, and other cases cited *supra.* These charges correspond to inspection fees. *Willis* v. *Standard Oil Co.,* 50 Minnesota, 290.

MR. JUSTICE HARLAN, after making the foregoing statement, delivered the opinion of the court.

The defendants insist that the ordinances in question are invalid for the want of power in the Board of Supervisors to adopt them. This objection does not seem to be well taken. By the California constitution of 1849 it was provided that "the Legislature shall have power to provide for the election of a Board of Supervisors in each county, and those supervisors shall jointly and individually perform such duties as may be prescribed by law." Subsequently, by an act approved April 25, 1863, it was provided that "the Board of Supervisors of the

city and county of San Francisco shall have power, by regulation or order, . . . to authorize and direct the summary abatement of nuisances; to make all regulations which may be necessary or expedient for the preservation of the public health and the prevention of contagious diseases; to provide, by regulation, for the prevention of contagious diseases; to provide, by regulation, for the prevention and summary removal of all nuisances and obstructions in the streets, alleys, highways and public grounds of said city and county," etc. Cal. Stat. 1863, p. 540. Again, in the state constitution of 1879, it was provided that "any county, city, town or township may make and enforce within its limits all such local, police, sanitary and other regulations as are not in conflict with general laws." Art. XI, § 11. Further, by an act, approved March 23, 1893, it was provided, among other things, that every franchise or privilege to erect or lay telegraph or telephone wires, to construct or operate railroads along or upon any public street or highway, or "to exercise any other privilege whatever hereafter proposed to be granted by the Board of Supervisors, Common Council, or other governing or legislative body of any county, city and county, city, town or district within this State, shall be granted upon the conditions in this act provided, and not otherwise." One of those conditions was that the fact that such franchise or privilege had been made, together with a statement that it was proposed to grant the same, should be advertised—the franchise or privilege to be awarded to the highest bidder. Cal. Stat. 1893, p. 288.

It may be here observed that under the charter of San Francisco the Board of Supervisors for the city and county of San Francisco constituted the legislative department for that municipality. *McDonald* v. *Dodge*, 97 California 112, 114; *Harrison* v. *Roberts*, 145 California 173.

In the above constitutional and statutory provisions is found full authority for the Board to make and enforce, within the city and county of San Francisco, all such reasonable sanitary and other regulations as are not in conflict with any general

statute or with the constitution, and which have for their object the preservation of the public health, by whatever cause endangered. It was substantially so ruled in the Circuit Court of the United States, Northern District of California, in *Alpers* v. *City and County of San Francisco*, 32 Fed. Rep. 503, Mr. Justice Field delivering the opinion of the court. The ruling in that case was followed in *National Fertilizer Co.* v. *Lambert*, 48 Fed. Rep. 458. See also *The People* v. *Board of Supervisors of Contra Costa County*, 122 California, 421.

It is said that the grant to Sharon, his associates and assigns, was, in no sense, a franchise. It is true that the title of the act of 1893 refers only to franchises. But the body of the act shows that the legislature intended to embrace privileges, exercised under public authority and not alone what may be, strictly, franchises. The exclusive right granted to Sharon, his associates and assigns, was certainly a privilege, and the Board of Supervisors had power to grant it in order to protect the public health. But independently of the above statutes the Board had power, under the constitution of the State, to make such sanitary regulations as were not inconsistent with the general laws, and that broad power carried with it the power, by contract and ordinance, to guard the public health in all reasonable ways.

The defendants criticise the ordinances because they give the exclusive privileges in question for a period of fifty years. But whether the period during which such privileges might be exercised, should be long or short, was a matter in the wise discretion of the Board and determinable wholly upon grounds of public policy. It may be that grants by public authority of privileges to be exercised for the benefit or in behalf of the public ought never to be for long periods. But it suffices to say that no such consideration can control the action of the judiciary.

The defendants insist that the ordinances in question are in violation of the Fourteenth Amendment of the Constitution, in that they deprive the householders of San Francisco of prop-

erty of value, by transferring it to the Sanitary Reduction
Works, without requiring compensation to be made; this, it is
contended, being in violation of the Fourteenth Amendment.
*Chicago, B. & Q. R. R. Co.* v. *Chicago,* 166 U. S. 226.

We do not perceive that the defendant corporation of Colo-
rado and the individual defendants who are not householders
are entitled to raise any such question. If the householders
do not complain but by silence assent to what the Board did, it
is not for others to say that the property of householders is
taken for public use without compensation; for householders,
if so minded, may waive any right they have to compensation
for their property destroyed to protect the public health. The
individual defendants, in their answer, claim to be household-
ers in San Francisco. But it seems that only about six of
them are householders. The presence, however, of that num-
ber as defendants makes it appropriate, to consider the objec-
tion just stated upon its merits.

In determining the validity of the ordinances in question it
may be taken as firmly established in the jurisprudence of this
court that the States possess, because they have never surren-
dered, the power—and therefore municipal bodies, under leg-
islative sanction, may exercise the power—to prescribe such
regulations as may be reasonable, necessary and appropriate,
for the protection of the public health and comfort; and that
no person has an absolute right "to be at all times and in all
circumstances wholly freed from restraint;" but "persons and
property are subject to all kinds of restraints and burdens,
in order to secure the general comfort, health, and general
prosperity of the State",—the public, as represented by its con-
stituted authorities, taking care always that no regulation,
although adopted for those ends shall violate rights secured
by the fundamental law nor interfere with the enjoyment of
individual rights beyond the necessities of the case. Equally
well settled is the principle that if a regulation, enacted by
competent public authority avowedly for the protection of
the public health, has a real, substantial relation to that object,

the courts will not strike it down upon grounds merely of public policy or expediency. *Railroad Co* v. *Husen*, 95 U. S. 465, 470, 471; *Mugler* v. *Kansas*, 123 U. S. 623, 661; *Lawton* v. *Steele*, 152 U. S. 133, 136; *Atkin* v. *Kansas*, 191 U. S. 207, 223; *Jacobson* v. *Massachusetts*, 197 U. S. 11, 27. In the recent case of *Dobbins* v. *Los Angeles*, 195 U. S. 223, 235, this court said that "every intendment is to be made in favor of the lawfulness of the exercise of municipal power making regulations to promote the public health and safety, and that it is not the province of the courts, except in clear cases, to interfere with the exercise of the power reposed by law in municipal corporations for the protection of local rights and the health and welfare of the people in the community."

The record abundantly discloses the grounds upon which the Board of Supervisors proceeded, in adopting the ordinances in question.

The preamble to Order No. 2965 shows that, in the judgment of the Board, the only effective mode to dispose of house refuse, butchers' offal, garbage, putrid or offensive animal or vegetable matter, refuse, ashes or other like matter, and to prevent such substances from being deposited in or upon the lots, lands and public streets of the city and county, or in the waters of the bay, to the prejudice of the public health, was by cremation or by some process of chemical reduction. The conviction of the Board that decided action on the subject was imperatively demanded for the general good seems to have strengthened. For, Order No. 12, adopted a year later, stated in its preamble that from time to time during previous years, the dumping of garbage, dirt, offal, house refuse, matter, ashes, cinders, sludge, acids or like matter, to fill in lots, and particularly in filling in water lots, had become so objectionable and deleterious to the public health that the attempt was made to mitigate such nuisances by covering them over with sand; that it had, however, become apparent that lots so filled and covered had thrown off noxious gases, deleterious to the public health, and when epidemic diseases were prevalent would become a

fruitful source of danger to the sanitary wellbeing of citizens; and that the Board of Health had called attention to and condemned the disposing of garbage and refuse matter for the purpose of filling in lots. Such were the reasons which moved the Board of Supervisors to adopt that order making it unlawful to deposit any of such substances upon streets, lots or lands, or in any water or waterway, within the city and county, and requiring that they be delivered at the plaintiff's works, to be there cremated and destroyed or subjected to such disposition and treatment as would effect a complete combustion of all gases and odors arising therefrom.

We perceive no ground to doubt the good faith of the Board of Supervisors; nor can we say that the mode adopted for the suppression of the evils in question was arbitrary or did not have a real, substantial relation to the protection of the public health.

Many of the questions involved in municipal sanitation have proved to be difficult of solution. There is no mode of disposing of garbage and refuse matter, as found in cities and dense populations, which is universally followed. In some cities' garbage receptacles, properly covered, are provided, sometimes by the householder, sometimes by the municipal authorities or the garbage collector. But even such devices often prove to be worthless for want of proper attention to them by householders. Then, the question arises for the consideration of the municipal authorities as to the frequency of the removal of garbage. The practice is not at all uniform. In some cities, it is collected seven times a week; in others, six, four, and three times a week. Again, questions arise as to the mode in which garbage should be collected, and the statement is made by those who have investigated the subject, that while "there appears a well-nigh unanimous demand on the part of health officers and oftentimes of the public generally, for the municipal collection of garbage," the "problem of garbage disposal has not been solved." Chapin's Municipal Sanitation in the United States, p. 670. Similar observations

might be made in reference to what is commonly called dry refuse, which, in many cities, includes ashes and all the rubbish accumulated in private houses, stores, market houses, and like places.

These references to the different methods employed to dispose of garbage and refuse have been made in order to show that the Board had before them a most difficult problem— unsolved by experience or science—as to the best or most appropriate method of protecting the public health in the matter of the disposal of the garbage, refuse and other materials found on private premises, and in hotels, restaurants and like places. The State, charged with the duty of safeguarding the health of its people, committed the subject to the wisdom and discretion of the Board of Supervisors. The conclusion it reached appears in the ordinances in question, and the courts must accept it, unless these ordinances are, in some essential particular, repugnant to the fundamental law. The general result which the Board of Supervisors sought to bring about was by cremation, or by such other treatment of the materials as would effect a complete combustion of all gases and odors arising therefrom. "Cremation," it is said, "is exclusively employed for getting rid of the garbage in England, and on the continent of Europe, and is rapidly coming into use in the United States"—the destruction by fire being theoretically "an ideal way, from a sanitary standpoint, for the disposal of garbage." Chapin, p. 714.

The defendants insist that the requirement that the substances mentioned should be delivered at the plaintiff's works for cremation or destruction, at the expense of the person, company or corporation conveying the same, was a taking of private property for public use without compensation. We cannot assent to this view. It is the duty, primarily, of a person on whose premises are garbage and refuse material to see to it, by proper diligence, that no nuisance arises therefrom which endangers the public health. The householder may be compelled to submit even to an inspection of his

premises, at his own expense, and forbidden to keep them or allow them to be kept in such condition as to create disease. He may, therefore, have been required, at his own expense, to make, from time to time, such disposition of obnoxious substances originating on premises occupied by him as would be necessary in order to guard the public health. If the house-holder himself removed them from his premises, it must have been at his own expense; and the scavenger who took to the crematory the material from the premises of origin, under some arrangement with the householder, was, in effect, the representative, in that matter, of the householder, and was performing a duty resting upon the householder. So that, if the requirement that the person conveying the material should pay a given price for having it cremated or destroyed, in effect, put some expense on the householder, that gave him no ground for complaint; for it was his duty to see to the removal of garbage and house refuse, having its origin on his premises. Still less has the licensed scavenger a right to complain; for his right to convey garbage and refuse through the public streets, in covered wagons, was derived from the public, and he was subject to such regulations as the constituted authorities, in their exercise of the police power, might adopt. The whole arrangement may be fairly regarded as one in the interest and for the convenience of the householder. He gets his proportionate benefit of any revenue derived by the city, and at the same time shares the protection given to him by the community. Nor did the destruction of garbage and refuse, at an approved crematory, amount, in itself, and under the circumstances disclosed, to a taking of private property for public use without compensation, even if some of the substances destroyed at the crematory had a value for certain purposes. The authorities were not bound, prior to the removal of such substances from the premises on which they were found, to separate those that were confessedly worthless from those which might be utilized. The garbage and refuse matter were all together, on the same premises, and as a

whole or in the mass they constituted a nuisance which the public could abate or require to be abated, and to the continuance of which the community was not bound to submit. And when the obnoxious garbage and refuse were removed from the place of their origin and put in covered wagons to be carried away, the municipal authorities might well have doubted whether the substances that were *per se* dangerous or worthless would be separated from such as could be utilized and whether the former would be deposited by the scavenger at some place that would not endanger the public health. They might well have thought that the safety of the community could not be assured unless the entire mass of garbage and refuse, constituting the nuisance, from which the danger came, was carried to a crematory where it could be promptly destroyed by fire; and thus minimize the danger to the public health.

Be all this as it may, the cremation and destruction of garbage and house refuse, under the authority of the municipal authorities, proceeding upon reasonable grounds, and at a place designated by law, as a means for the protection of the public health, cannot be properly regarded, within the meaning of the Constitution, as a taking of private property for public use, without compensation, simply because such garbage and house refuse may have had, at the time of its destruction, some element of value for certain purposes. With the knowledge of the householder the scavenger receives the garbage and refuse matter, that which, if separated, might have value being mingled with that which is, in itself, noxious and worthless. The entire mass goes into the same covered wagon, and the authorities are not bound, before its destruction at the crematory, to cause the good to be separated from the bad, but could require, as the ordinances in question did, that the substances be promptly conveyed to the designated crematory and destroyed by fire. Such a disposition of the contents cannot be regarded as a taking of private property for public use without compensation.

This court has said that "the possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order and morals of the community. Even liberty itself, the greatest of all rights, is not an unrestricted license to act according to one's own will." *Crowley* v. *Christensen*, 137 U. S. 86, 89. In *Mugler* v. *Kansas*, 123 U. S. 623, 669, it appeared that certain distillery property in Kansas was purchased, at a time when it was lawful in that State to manufacture and sell spirituous liquors, but which property, by reason of the subsequent prohibition of such manufacture and sale, had become of no value, or had materially diminished in value. The owner insisted that by the necessary operation of the prohibitory statute, his property was in whole or in part taken for public use without compensation. But this court said: "The power which the States have of prohibiting such use by individuals of their property as will be prejudicial to the health, the morals, or the safety of the public, is not—and, consistently with the existence and safety of organized society, cannot be—burdened with the condition that the State must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by a noxious use of their property, to inflict injury upon the community. The exercise of the police power by the destruction of property which is itself a public nuisance, or the prohibition of its use in a particular way, whereby its value becomes depreciated, is very different from taking property for public use, or from depriving a person of his property without due process of law. In the one case, a nuisance only is abated; in the other, unoffending property is taken away from an innocent owner." In Sedgwick's Treatise on Statutory and Constitutional Law the author says that "the clause prohibiting the taking of private property without compensation is not intended as a limitation of those police powers which are necessary to the tranquillity of any well-ordered community, nor of that general

power over private property which is necessary for the orderly exercise of all governments. It has always been held that the legislature may make police regulations, although they may interfere with the full enjoyment of private property, and though no compensation is made." pp. 434, 435.

Without further discussion, we hold, for the reasons stated, that the Circuit Court and Circuit Court of Appeals properly refused to adjudge that these ordinances were invalid.

Other questions have been discussed by counsel, but they do not require special notice at our hands. We are content with the disposition made of them in the courts below.

*The decree of the Circuit Court of Appeals is*

*Affirmed.*

MR. JUSTICE BREWER and MR. JUSTICE PECKHAM dissented.