**HYBUD EQUIPMENT CORP.; Budoff Iron & Metal Co.; Glenwillow Landfill, Inc.; Waldo A. Sober, Jr.; J. P. Hawley Sanitation, Inc. & G. G. Kovach, Plaintiffs-Appellants,**

v.

**CITY OF AKRON, OHIO; John S. Ballard; Ray Kapper; Elsie Reaven; James R. Williams; Vincent Ciraco; Robert Goehler; Reginald Brooks; Kathleen Griessing; Robert Otterman; Mickey Eritano, Jr.; John Frank; Don Plusquellic; William C. Grimm; Robert Edwards; County of Summit, Ohio; Mark Ravenscraft; Ted Coles; Don Stephens; Ohio Water Development Authority, Defendants-Appellees.**

No. 80–3121.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 8, 1980.

Decided July 17, 1981.

William C. Brashares, Cladouhos & Brashares, Washington, D. C., Joseph E. Abden-

our, John L. Wolfe, Hershey & Browne, Akron, Ohio, for plaintiffs-appellants.

Eben G. Crawford, William H. Baughman, Jr., Cleveland, Ohio, John E. Holcomb, William F. Spicer, Asst. Dir. of Law, City of Akron, Steven J. Schwartz, Timothy Hartman, Asst. Pros. Attys., Akron, Ohio, James L. Bickett, Cuyahoga Falls, Ohio, for defendants-appellees.

William M. Bradner, Jr., Terry A. Thompson, Chadbourne, Parke, Whiteside & Wolff, New York City, for amicus curiae American Paper Institute.

Richard J. Lazarus, Dept. of Justice, Washington, D. C., for U. S. A. amicus curiae.

Before MERRITT and BOYCE F. MARTIN, Jr., Circuit Judges; GORDON, Senior District Judge.*

MERRITT, Circuit Judge.

In the late 1960s, the City of Akron was confronted by the need to develop new sources of energy and to find alternative methods of waste disposal. In an attempt to alleviate both problems, the City decided to construct a $55 million energy recycling plant, a facility that generates energy in the form of steam heat from the incineration of trash.[1] Plaintiff-appellants seek injunctive relief against several actions undertaken by the City and other defendants to guarantee the feasibility of the plant, alleging that those actions violate the federal antitrust laws and the due process, interstate commerce and takings clauses of the Constitution. Underlying the legal issues are related and sometimes conflicting national policies respecting resource and energy conservation, environmental protection and energy production. After reviewing the questions presented, the District Court entered judgment for the defendants on all claims. *Glenwillow Landfill, Inc. v. City of Akron,* 485 F.Supp. 671 (N.D.Ohio 1979). The issues presented on appeal are whether the City has violated either federal constitutional provisions or the antitrust laws by adopting a city ordinance monopolizing garbage collection and disposal and eliminating competition in the market for recyclable wastes. We find no federal constitutional or statutory violation and accordingly affirm.

## I. STATEMENT OF THE CASE

### A. The Akron Energy Recycling Plant and the Ordinance in Question

In the late 1960s, Akron's solid waste disposal landfills were approaching capacity, and a new landfill operating in violation of EPA standards was immediately challenged in court. In addition, Ohio Edison, which supplied steam heat to businesses in downtown Akron, sought to abandon the Akron market. The City began to search for an alternative energy supply. After a period of study, the City decided to develop the solid waste recycling plant, but the revenue bonds issued to finance the project proved unmarketable. The City turned to the Ohio Water Development Authority, a state agency, for financial assistance. It agreed to finance the project but later discovered that it could not secure the bonds from its general fund.

At this juncture, in 1976, the firm of Dillon, Reed & Co. was hired to study and possibly underwrite the bonds. To improve the marketability of the $46 million bond

---

* The Honorable James F. Gordon, Senior District Judge, United States District Court for the Western District of Kentucky, sitting by designation.

1. Municipal efforts in the field of waste recovery and energy recycling have developed dramatically in the last decade. In its March 1981 report, the National Center for Resource Recovery, Inc. listed sixty-three "materials and energy recovery facilities," at various stages of construction or operation, and varying in capital cost from $200,000 to $160 million, located in twenty-six states throughout the nation. Almost all the facilities include a local government entity as a primary participant, and almost all use one or more of several processes to convert deposited solid waste into energy. A smaller number are also equipped to recover recyclable materials, such as ferrous and nonferrous metals and glass, for reuse. The Akron facility that is the focus of the present lawsuit, which was constructed at a cost of $55 million and has a capacity of one thousand tons of waste per day, appears to be among the more ambitious projects.

issue, the underwriters imposed the requirement that an agreement be executed between the Water Authority, Summit County (in which Akron is situated), and the City of Akron. Among the covenants included in the agreement was the requirement that the City enact an ordinance that would guarantee a supply of solid waste for the plant.

2. The pertinent provisions of the cooperative agreement read as follows:

> [The City of Akron] will not establish, construct, or operate nor consent to the establishment, construction or operation of any facility for the disposal or other treatment of Solid Waste which is acceptable for disposal [at the plant] and for which the [plant] has capacity available and which the [Water Authority] determines to be detrimental to the [plant], and, further, to the extent legally permissible, it will oppose the establishment, construction or operation of such a facility. . . .
>
> * * * * * *
>
> For the term of this Agreement, the [City] shall require that all collectors and haulers of Solid Waste within the [City] be licensed by the [City] and all such licenses shall provide that all collectors or haulers of Solid Waste shall dispose of all Solid Waste generated within the corporate limits of the [City] which is acceptable for disposal by the [plant] to be delivered to the [plant] for disposal through the [plant] and require that such haulers and collectors and the [City] pay or cause to be paid the fees and charges imposed by the [City] for the disposal of Solid Wastes at the [plant]. The [City] will take all available action, administrative, judicial and legislative, to cause all Solid Waste generated within the corporate limits of the [City] and which is acceptable for disposal by the project, to be delivered to the [plant] for disposal through the [plant].
>
> * * * * * *
>
> The [City] shall use its best efforts to establish rates and charges for the disposal of Solid Waste through the [plant] at a level which assures an adequate supply of Solid Waste for the purpose of the [plant] and, subject to the foregoing, shall be comparable with competitive charges for such services. . . .
>
> * * * * * *
>
> The County will not establish, construct, or operate nor consent to the establishment, construction or operation of any facility for the disposal or other treatment which [the Water Authority] solely determines to be detrimental to the [plant] of Solid Waste which is acceptable for disposal by the [plant] and for which the [plant] has capacity available,

This is the ordinance challenged here. It was passed by the City in October 1976. Together the agreement[2] and the ordinance[3] prohibit the establishment of alternative waste disposal sites, require all garbage collectors within the City and County to deposit at the plant all waste "acceptable for disposal" at the facility, and require all collectors to pay a "tipping fee" when they

> and further to the extent legally permissible, it will oppose the establishment, construction or operation of such facilities.
>
> * * * * * *
>
> The County will take all legally available action, administrative, judicial and legislative, to cause all Solid Waste generated within the County and which is acceptable for disposal by the [plant] and for which the [plant] has capacity available, to be delivered to the Project for disposal through the [plant].

3. The challenged provisions of the ordinance read:

> Until such time as the City's recycle energy plant begins accepting rubbish for disposal, no rubbish shall be deposited by the holder of a rubbish hauler's license within the corporate limits of the City except at a place designated in writing by the Mayor. From and after the date on which such plant begins accepting rubbish for disposal, all rubbish collected within the corporate limits of the City by a holder of a rubbish hauler's license shall be deposited at such plant; provided that rubbish which is not acceptable for disposal by such plant shall not be deposited within the City except at a place designated in writing by the Mayor.
>
> * * * * * *
>
> No person, except duly authorized collectors of the City or private haulers licensed pursuant to law shall collect or remove any garbage, or rubbish accumulating within the City or use the streets, avenues and alleys of the City for the purpose of collecting or transporting the same. All licenses granted to such private haulers and all contracts or other forms of authorization of duly authorized collectors shall require that all garbage or rubbish collected and transported under authority for disposal by the City's energy plant, be disposed of at such plant from and after the date on which such plant begins accepting garbage and rubbish for disposal.

Another section of the ordinance establishes fees for the collection and disposal of garbage for 1978 and authorizes a City official to promulgate rules on the collection of the fees and, with the Council's consent, to make annual adjustments in the charges.

deposit waste at the plant. Collectors violating the ordinance could lose their licenses and be subject to criminal penalties. These enactments were considered necessary for the financial success of the plant, for the defendants and the underwriters feared that without such restrictions it would be impossible to guarantee a sufficient waste supply from which a steady source of energy for potential customers could be generated. Some materials are not deposited at the plant, such as recyclables presorted at the source that never enter the waste stream, and materials judged unacceptable for disposal at the facility (*e. g.*, hazardous wastes and solid matter that the plant is unequipped to incinerate). The wastes "acceptable for disposal" at the facility consist of two types of solid materials—those that are incinerated to generate steam, and those (primarily ferrous) that cannot be burned but can be recovered and recycled. Some non-metal recyclable materials, such as paper products, which prior to the enactment of the ordinance were separated out and sold by the collectors, now will be incinerated instead to generate steam. Concern over the decision to destroy recyclable paper products caused the American Paper Institute to file an amicus brief challenging the legality of the ordinance.

According to this plan, revenue is earned by the plant in three ways: from the generation and sale of energy, from the tipping fees paid by collectors disposing of waste at the facility, and from the sale of recyclables recovered at the facility. The City has agreed with Teledyne National, the private company that has contracted to operate the plant that Teledyne may retain one-half of the revenues earned from sale of recovered materials.

The plan established in the agreement and ordinance interferes with the previous operations of the plaintiffs, landfill operators and collectors of solid waste in the County. Previously Hybud Equipment Corp. collected waste in the City, charging customers a fee for the service. The waste was hauled to a "transfer station" run by an affiliated company, Budoff Iron & Metal Corp., where recyclable materials were separated out and sold. Hybud paid rebates to its customers from the payments it received from selling the recyclables. The waste that could not be sold was hauled to landfills where Hybud paid a tipping fee to deposit it. Hybud in effect paid customers for the valuable recyclables it received from them while charging them for the service of hauling away nonrecyclable waste. The other plaintiffs are other waste collectors in the City and County and operators of landfill disposal sites that received a significant portion of their income from tipping fees paid by collectors hauling waste originating in the City and the County.

The ordinance and agreement interfere with plaintiffs' businesses in three ways. First, the income of the landfills is substantially reduced because they no longer receive waste (except materials unacceptable at the plant) originating in the City. Second, the collectors are required to haul waste to the plant and pay its fixed tipping fee. This eliminates the competition among waste disposal sites, grants the plant the power to fix tipping fees unrestrained by the forces of a competitive market, and deprives collectors of their former freedom to shop among disposal sites and to patronize those supplying services at minimal combined tipping and transportation costs. Finally, the business of recovering and selling valuable recyclables is removed from collectors such as Hybud. Instead of receiving payments from the sale of the recyclables they collect, haulers are required to deposit them at the plant and pay a tipping fee, as with the nonrecyclable solid waste deposited there. The plant treats the recyclables as it wishes, either burning them to create energy or separating them out and selling them. Either way, the revenue generated from the use of the recyclables is retained by the plant.

Plaintiffs do not challenge the establishment of the plant. The construction of an additional facility to compete in the waste disposal industry, they acknowledge, violates no law. Rather, they challenge the additional actions taken by the defendants to eliminate competition in the industry and

to make the plant the sole waste disposal facility in the Akron area. Plaintiffs argue that the economic viability of the plant may not be insured at the price of destroying competition. They seek an injunction prohibiting enforcement of the ordinance and a declaration that the ordinance and other concerted activities among the defendants are illegal. Defendants concede that the agreement and the ordinance were enacted upon the urgings of the project's underwriters in order to guarantee the project's financial success. The defendants as well as the United States Department of Justice in an amicus brief filed on behalf of the Environmental Protection Agency and the Department of Energy argue, however, that the anticompetitive steps taken to make the plant feasible accord with national energy and environmental policy.[4]

### B. Akron's Authority to Build the Plant and Restrict Competition Under State Law

 Akron exercises its municipal powers under a grant of municipal home rule found in Ohio's Constitution. Article XVII, § 3 reads:

> Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws.

Section 7 of Article XVIII authorizes municipalities to adopt charters for their government and, "subject to the provisions of section 3 of this article, exercise thereunder all powers of local self-government." Ohio case law holds that these state constitutional provisions "pass the sovereign power of municipal government . . . directly from the people of the state to the people of the city" and has the effect of delegating a part of the state's "sovereignty" to the city, *State ex rel. Toledo v. Lynch*, 88 Ohio St. 71, 102 N.E. 670 (1913), including the power to establish a municipal monopoly for the

collection and incineration of garbage. *State ex rel. Moock v. Cincinnati*, 120 Ohio St. 500, 166 N.E. 583, *cert. denied*, 280 U.S. 578, 50 S.Ct. 31, 74 L.Ed. 628 (1929).

In addition, Ohio statutes delegate to municipalities the authority to regulate the disposal of garbage. Ohio Rev.Code § 715.-43 grants municipalities the authority to "provide for the collection and disposition of sewage, garbage, ashes, animal and vegetable refuse, dead animals, and animal offal, and may establish, maintain, and regulate plants for the disposal thereof." Similarly, Ohio Rev.Code § 717.01(C) empowers municipalities to "[e]rect a crematory or provide other means for disposing of garbage or refuse. . . ."

The District Court also found authority for the City to engage in the challenged activities in the legislation granting the Water Authority power to develop solid waste treatment facilities. Ohio Rev.Code § 6123.03 states that the Water Authority is established to protect health and aesthetic values through efficient methods of "disposal . . . or recovery of resources from solid wastes." The Authority is authorized to construct and maintain solid waste projects or to make agreements for their maintenance.

The Authority is empowered to make loans and grants and issue bonds to carry out the statutory purposes and to guarantee the feasibility of projects developed under this statute. Ohio Rev.Code §§ 6123.03, 6123.04, 6123.06 *et seq.* The statute authorizes the Water Authority to "[m]ake and enter into all contracts and agreements and execute all instruments necessary or incidental to the performance of its duties and the execution of its powers under Chapter 6123 . . . ," § 6123.04(I), and to "[d]o all acts necessary or proper to carry out the powers expressly granted in Chapter 6123. . . ." § 6123.04(P). The District Court found that pursuant to this statutory scheme the state legislature had authorized the challenged anticompetitive activities.

---

**4.** In its amicus brief, the United States has argued that the policies furthered by defendants' actions have been repeatedly addressed by Congress, in, *e. g.*, Energy Policy and Conservation Act, 42 U.S.C. §§ 6201 *passim*; Energy Conservation and Production Act, 42 U.S.C. §§ 6801 *passim*; and Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *passim*.

## II. THE TAKINGS AND DUE PROCESS CLAUSE QUESTIONS

Control of local sanitation, including garbage collection and disposal, like fire and police protection, is a traditional, paradigmatic example of the exercise of municipal police powers reserved to state and local governments under the Tenth Amendment. Ordinances regulating garbage collection and disposal are rationally related to a matter of legitimate local concern. Courts in literally hundreds of reported cases have upheld the authority of local governments to monopolize and control local garbage collection by eliminating or restraining competition among private collectors. *See* Annots., *Validity of Statutory or Municipal Regulations as to Garbage*, 15 A.L.R. 287 (1921); 72 A.L.R. 520 (1931); 135 A.L.R. 1305 (1941). If any area of the law can be said to be well settled, this one is.

In three pertinent cases, two at the turn of the century in the United States Supreme Court, *California Reduction Company v. Sanitary Reduction Works*, 199 U.S. 306, 26 S.Ct. 100, 50 L.Ed. 204 (1905); *Gardner v. Michigan*, 199 U.S. 325, 26 S.Ct. 106, 50 L.Ed. 212 (1905), and one in the twenties in the Ohio Supreme Court, *State ex rel. Moock v. City of Cincinnati*, 120 Ohio St. 500, 166 N.E. 583, *cert. denied*, 280 U.S. 578, 50 S.Ct. 31, 74 L.Ed. 628 (1929), three cities, San Francisco, Detroit and Cincinnati, each decided to change local garbage collection and disposal practices by ordinance. Each established a reduction plant or "crematory" and gave one private company a monopoly over garbage collection. The ordinances put existing private garbage collectors out of business; they prohibited existing private collectors from competing with the private contractor who was given the municipal monopoly. In each case the private collectors claimed that the change constituted a taking without just compensation and an interference with established rights of private property, the right to compete in the market place, in violation of substantive due process under the Fourteenth Amendment. In the Cincinnati case the private contractors also argued that the city had not been delegated the authority under the

state constitutional home rule provisions to restrain trade and that the ordinance violated the garbage collector's right "to private property, and amounted to a special privilege and the creation of a monopoly in favor of the city's public contractor." 120 Ohio St. at 507, 166 N.E. 583.

After noting that "[m]any of the questions involved in municipal sanitation have proved to be difficult of solution"—questions "unsolved by experience or science"— the United States Supreme Court held that the creation of such monopoly "cannot be properly regarded, within the meaning of the Constitution, as a taking of private property for public use, without compensation, simply because such garbage and house refuse may have had, at the time of its destruction, some element of value for certain purposes." *California Reduction, supra*, 199 U.S. at 320–21, 323, 26 S.Ct. at 104–105. As support for this result the Court quoted from Sedgwick's Treatise:

> In Sedgwick's Treatise on Statutory and Constitutional Law the author says that "the clause prohibiting the taking of private property without compensation is not intended as a limitation of those police powers which are necessary to the tranquillity of any well-ordered community, nor of that general power over private property which is necessary for the orderly exercise of all governments. It has always been held that the legislature may make police regulations, although they may interfere with the full enjoyment of private property, and though no compensation is made."

*Id.* at 324–25, 26 S.Ct. at 105–06.

The Supreme Court then went on to hold, "according to well-settled principles," that the concept of substantive due process— then in its heyday—did not protect the property rights of the garbage collectors although the cities might have adopted a less restrictive solution to the problem. "If it be said that the city might have adequately guarded the public health and at the same time saved the property rights," the Court concluded, "the answer is that the

city evidently thought otherwise, and we cannot confidently say that its constituted authorities went beyond the necessities of the case." *Gardner, supra*, 199 U.S. at 333, 26 S.Ct. at 109. The Ohio case came to the same conclusion:

> [W]e do not enter upon a virgin field, since the overwhelming weight of authority, both state and federal, upholds the municipal right to regulate, supervise, and control sanitation, including the collection and disposal of garbage, under the police power of the city and state; and this may be done, notwithstanding the fact that garbage may have animal food value and the authority for such collection and disposal has been exclusively confided to a single person or agency.

120 Ohio St. at 507–08, 166 N.E. 583. Akron is an Ohio home-rule city, like Cincinnati, and on the basis of these three cases and the general law in this area we are satisfied that the city has not violated the takings or due process clause of the United States Constitution or the state home rule provisions by setting up a new reduction, "thermal transfer," or "energy recycling" plant and by requiring that local garbage collectors bring all their garbage to the plant, including recyclable, or marketable, nonnoxious garbage.

The plaintiffs and the American Paper Institute argue, however, that the increased value of wastes and the City's appropriation of that value render the old cases anachronisms that should be set aside. They argue that changed economic circumstances and heightened environmental concern make separating and selling such recyclable wastes as metal, paper, and cardboard more feasible now than in the past. They point out that there now exist competitive markets for recyclable wastes. They argue that Akron's purpose in acquiring a monopoly over garbage is not public health, as was the purpose in the old cases, but rather making its energy plant more profitable by insulating it from competition for raw materials. A monopoly imposed for that purpose, they argue, is neither necessary nor efficient.

The old cases are not anachronisms. They are not distinguishable on any of these grounds. The solid waste disposal problem is as serious today for cities as in the past, perhaps more serious. Landfill areas are running out and causing serious air and water pollution and aesthetic problems. The record demonstrates that this is the problem that caused Akron—a heavily industrial area—to plan and build its energy recycling plant.

Nor can the old cases be distinguished because of changed technology. The Supreme Court and other courts upheld governmental monopoly of solid waste years ago while recognizing explicitly that some wastes have value and could be sold in the market place. The record does not demonstrate that there has been a substantial change in the relative value of recyclable waste. Paper, cardboard boxes and metal have been a substantial part of garbage for years. We have perhaps become more conscious of the need to conserve and reuse resources, but this fact does not distinguish the old cases.

Neither does the fact that the City appropriates the value and sells some of the recyclable wastes, or chooses in manufacturing energy to burn some of the paper and cardboard rather than resell it, distinguish the old cases. Under these cases, the City could have simply taken over all garbage collection as in San Francisco, Detroit and Cincinnati, depriving existing collectors of any business at all. Here the greater would seem to include the lesser, and the fact that the City adopted a less restrictive alternative is not a valid distinction. Since the private collectors claim that they gave substantial rebates to their customers for the recyclable wastes they sold in the market place, at most the value of the recyclables appropriated by the city represents a licensing fee, service charge or tax imposed on persons in the City who generate and collect garbage.

The requirement that collectors deposit at the plant some valuable wastes, the sale of which supports the costs of incineration and the production of energy, is a valid exercise

of the police power. The City may appropriate the value of marketable items abandoned by the owner and mixed in the stream of garbage in order to pay part of the general social costs of waste disposal. In addition Akron, a heavily industrial city, was faced with the loss of its main source of supply of energy for many of its downtown industrial and commercial businesses. The economic and social consequences of interruption in the supply of steam would be serious and justify the exercise of the police power challenged here.

The three cases discussed above also satisfy us that the involvement of the private company, Teledyne, in the operation of the plant in return for one-half of the profits from sale of recyclables is not improper under the takings or due process clause because it redistributes income from private collectors to Teledyne. In each of the cases discussed above the city granted a monopoly right to collect garbage to a single company, permitting that company alone to engage in a profitable business that had previously been done by several firms. The courts held that the public interest in regulation of the collection of garbage was so great that monopolization of the service and the attendant transfer of profits did not violate the takings or due process clause.

### III. THE INTERSTATE COMMERCE QUESTION

■ In recent cases the Supreme Court has developed a test to determine the validity of government actions challenged under the interstate commerce clause. *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970); *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Minnesota v. Clover Leaf Creamery Co.,* 101 S.Ct. 715 (1981). In *Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979), the Court presented the test as follows:

> [W]e must inquire (1) whether the challenged statute regulates evenhandedly with only "incidental" effects on inter-

state commerce, or discriminates against interstate commerce either on its face or in practical effect; (2) whether the statute serves a legitimate local purpose; and, if so, (3) whether alternative means could promote this local purpose as well without discriminating against interstate commerce.

■ In the present case, there is no indication that the City's actions are protective measures designed to discriminate against interstate commerce. The appropriation of value under the police power falls on local people who vote in Akron, not on people from out of town. The effect on commerce is minimal. The City continues to sell the recyclable metals in commerce just as did the private collectors. The fact that the city burns some paper and cardboard that would otherwise be sold in commerce by the private collectors does not discriminate against or substantially burden interstate commerce. The paper is converted to energy that is sold to Akron tire plants and other businesses. The record does not indicate that any national or regional market for paper is substantially affected by Akron's conduct or that supply would be restricted enough to affect prices. The only identifiable costs imposed are local.

Unlike the statutes in *Dean Milk Co. v. City of Madison,* 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951) (municipal enactment requiring that milk be pasteurized within five mile radius of city violates commerce clause), *City of Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978) (state law prohibiting importation of garbage into state invalidated under commerce clause as an "economic protectionist" measure designed to impose burden on residents of other states), and other commerce clause cases relied on by plaintiffs, Akron's legislation does not have the effect of taxing or preventing competition by nonresidents. It is not special interest legislation that discriminates against out-of-town people who vote elsewhere in favor of local residents and local voters. The economic costs of the Akron measure fall hardest on people who generate and collect garbage in

the City of Akron. Since the Akron ordinance does not discriminate against, or otherwise seriously burden, interstate commerce, the plaintiffs' arguments based on the commerce clause are unpersuasive. Defendants' regulations, therefore, do not violate any of the standards set forth by the Supreme Court in *Pike v. Bruce Church, Inc.* and *Hughes v. Oklahoma, supra.*

## IV. THE ANTITRUST QUESTION

■ The remaining federalism issue is whether the Sherman Act preempts and displaces local legislation creating municipal monopolies—whether restraining competition in solid waste by local government "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting the antitrust laws. *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

Plaintiffs argue that the state action exemption to the antitrust laws first articulated in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) (upholding a California agricultural program restricting the marketing of raisins in order to maintain farm prices), does not apply to cities unless the state by legislation has explicitly authorized the local anti-competitive conduct and maintains a high degree of supervision over the local conduct.

For this argument the plaintiffs rely primarily on *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), a case in which a municipal electric utility sought to force customers who lived outside the city into tying and other anticompetitive arrangements. Four members of the Court in that case agreed that the state action exemption does not protect municipalities from antitrust liability when their anticompetitive actions are not (a) "directed or authorized" and (b) "supervised" by the state as a part of a state policy to substitute regulation or monopoly for competition. *Id.* at 410, 98 S.Ct. at 1135 (discussing *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977)). *Accord, California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). Chief Justice Burger concurred specially in the opinion, finding the city subject to liability under the Sherman Act, but his reasoning was entirely different from the other members of the majority. He reasoned that the state action exemption should be inapplicable when cities are engaged in business activity, as distinguished from a governmental function. He viewed the operation of a municipal electric company as an entrepreneurial or proprietary function and therefore subject to the antitrust laws. Four members of the Court dissented on the ground that local governmental bodies are simply not subject to the Sherman Act. Another possible rationale for the decision of the majority arises from the fact that the city was seeking to exercise market or monopoly power outside its corporate boundaries, that is, outside the area in which it was empowered to act as a government under state law. Although the opinions do not stress this fact, it may turn out that the narrow holding of the case is that a city loses its antitrust exemption if it competes with others outside the boundaries of its governmental authority in an area in which it is not politically accountable.

It is difficult for us to apply the *Lafayette* decision since the plurality and dissenting opinions are each supported by four justices, and no line of reasoning commands a majority of the Court. Whatever principle the Supreme Court may settle on in the future respecting municipal antitrust liability, however, we believe the city of Akron is exempt from the Sherman Act in this case. Garbage collection and the operation of incineration plants are traditional activities of local government. As discussed above, the reported cases, state and federal, have long allowed municipalities to create monopolies and restrain competition in carrying out this function. Moreover, in Ohio, the home rule provisions of the state Constitution, as interpreted by the Ohio Supreme Court in the *Cincinnati* case, *supra*, authorize local government to create a municipal solid waste monopoly. The legal system of the

state specifically allows the municipal ordinance in question here, and an agency of the state, the Water Authority, maintains some oversight of the facility. In addition, the City is acting entirely within its own governmental boundaries. It is affecting people to whom it is politically accountable. Finally, the United States government has advised us that this municipal activity is in accord with federal energy and environmental policy as established in the Resource Conservation and Recovery Act, and as practiced by the Environmental Protection Agency and the Department of Energy.[5] These departments are encouraging and assisting cities and towns in building such facilities and controlling solid waste collection and disposal.

Scholars have pointed out that the essential conflict of values here is the conflict between the ideals of competition and free markets embodied in the Sherman Act and the principles of federalism contained in the Tenth and Eleventh Amendments.[6] In *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), the Supreme Court reviewed the limits imposed by the Tenth Amendment upon Congressional authority to regulate state governmental activities under its commerce clause power. The Court held that Congress could not "directly displace the States' freedom to structure integral operations in areas of traditional governmental functions...." *Id.* at 852, 96 S.Ct. at 2474. Various courts have since used and refined the *National League of Cities* test to determine which of the multitude of local governmental activities are insulated from federal regulation. *See, e. g. Amersbach v. City of Cleveland,* 598 F.2d 1033 (6th Cir. 1979) (operation of metropolitan airport an integral governmental function; "terms 'traditional' or 'integral' are to be given a meaning permit-

ting expansion to meet changing times"); *United Transportation Union v. Long Island Ry. Co.,* 634 F.2d 19 (2d Cir. 1980) (provision of commuter rail service an integral governmental function; "not only is [rail service] essential to the public, but it is also essential that the government step in to furnish it"). Although the scope of Tenth Amendment limitations on affirmative congressional action is narrow, Tenth Amendment values should not be narrowly read when Congress has not expressly or by clear implication displaced a traditional exercise of local police power.

Since solid waste, disposal including the regulation of garbage collection, incineration and "recycling" is a customary area of local concern long reserved to state and local governments by practice, tradition and legal precedent, the Sherman Act should not apply. Tenth and Eleventh Amendment values support the authority of local governments to act in this field. Their plenary, governmental power to deal with such local problems affecting the public interest should not be preempted or displaced by general statutory policies favoring an economic model of competition for businessmen and industrialists operating in private markets.

Finally, there is a policy argument that even if defendants may regulate or monopolize the collection and disposal of nonrecyclable, valueless waste—whether for public health and safety or economic reasons— they may not do so for recyclables. This is because once recyclables are separated from the mass of garbage, their transport and reuse cause no danger to the public health and impose no costs upon the community. In addition, a market for recyclables has grown up in recent years, whose development should be encouraged rather than in-

**5.** Congress has explicitly found that solid waste represents a potential source of energy and that technology exists to produce energy from waste. It has recognized the need to use wastes "to develop alternative energy sources ... in order to reduce our dependence" on conventional sources. 42 U.S.C. § 6901(d).

**6.** *See, e. g.,* Blumstein & Calvani, *State Action as a Shield and a Sword in a Medical Services Antitrust Context:* Parker v. Brown *in Constitutional Perspective,* 1978 Duke L.J. 389; Rogers, *Municipal Antitrust Liability in a Federalist System,* 1980 Ariz. State L.J. 305; Thomas, City of Lafayette's *State Action Test Reformulated: A Meaningful Standard of Antitrust Immunity for Cities,* 1980 Ariz. State L.J. 345.

hibited by the government. Finally, because no market failures exist leading to the creation of a natural monopoly, defendants are not economically justified in their intervention and regulation in the market for recyclables.

We are uncertain whether or not this argument represents good public policy. The legislators, planners and administrators involved do not agree with it. The planners and legislators for the City, the Environmental Protection Agency and the Department of Energy agree that private markets should be replaced by municipal control of recyclable wastes in this instance. The policy question here, in our judgment, is debatable and should not be taken out of municipal hands by federal courts in the absence of congressional intent clearly expressed.

Accordingly, the judgment of the District Court is affirmed.