# CIRCUIT COURT NO. 2 OF BALTIMORE CITY.

Filed November 26, 1913.

## G. WILLIAM STUHR
## VS.

THE MAYOR AND CITY COUNCIL OF BALTIMORE AND THE MARYLAND SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS, A BODY CORPORATE.

*Emmet Wallace White* and *R. Contee Rose* for plaintiff.

*Isaac Lobe Straus* and *Robert F. Leach, Jr.,* for defendants.

GORTER, J.—

The object of this suit is to have an alleged contract between the Mayor of the city and the defendant, the Society for the Prevention of Cruelty to Animals, declared invalid.

The plaintiff, who is a taxpayer, complains that the agreement between the Mayor and the society under which the latter has been seizing and disposing of the dogs running at large in the city is invalid, because in making such agreement the Mayor failed to comply with sections 14 and 15 of the City Charter. These sections require that all contracts for work and material to be furnished the city exceeding $500 shall be awarded after advertisement to the lowest bidder.

The society has been doing this work for a number of years. In 1898 it was instrumental in having an ordinance passed providing for the licensing of dogs and for the seizure and disposing of them in a manner more humane than the old method then in vogue.

This ordinance is No. 96, approved June 15, 1898. It repeals and re-enacts a number of sections of the City Code of 1893. Section 23, with which we are chiefly concerned in this case, is as follows: "The Mayor of the city is hereby authorized and empowered, under the advice of the City Solicitor, to contract for and on behalf of the Mayor and City Council of Baltimore with the Maryland Society for the Prevention of Cruelty to Animals, or any other corporation or individuals or individual as he in his discretion may deem best for the seizure and destruction of such unlicensed animals of the dog kind as shall from time to time be found running at large within the limits of the city of Baltimore; provided, however, that such contract shall not be for a longer period than three years unless renewed, nor for a

greater contract price annually than the sum of two thousand dollars ($2,000) and the net amount of money received by the Comptroller for license fees and fines remaining after payment of the expenses incurred by him in carrying out his duties under this ordinance; provided, however, that any excess of money paid the contractors under this ordinance after paying the expenses incurred by such contractor shall revert to the City Treasury."

In pursuance of this ordinance the following agreement was entered into:

"This agreement made and entered into this 29th day of June, in the year 1898, by and between William T. Malster, Mayor of the City of Baltimore, acting under the advice of John E. Semmes, City Solicitor, for and on behalf of the Mayor and City Council of Baltimore of the first part, and the Maryland Society for the Prevention of Cruelty to Animals of Baltimore City, a body corporate, of the second part.

Witnesseth, that for a period of three years, accounting from the day of the date of these presents, the said Maryland Society for the Prevention of Cruelty to Animals shall seize or cause to be seized all unlicensed animals of the dog kind as shall from time to time be found running at large within the limits of the city of Baltimore, and, unless the same shall be redeemed within forty-eight hours, may kill or cause to be killed the said animals in as speedy and painless a manner as possible, said work to be done in accordance with the provisions of an ordinance, approved June 15th, 1898, entitled "An ordinance to repeal sections 19 to 35, inclusive, of Article 33 of the Baltimore City Code of 1893, and to re-enact sections 19, 20, 21, 23 and 25 with amendments."

In consideration of the performance of said duties, the said Mayor and City Council of Baltimore shall pay to the said party of the second part the sum of two thousand dollars annually during the said three years, and the net amount of license fees and fines provided for in and collected after the passage of said ordinance, the excess of all moneys paid said party of the second part by said party of the first part under said ordinance after paying the expenses incurred by said party of the second part to revert to the City Treasury.

In order to ascertain the cost of conducting the discharge of the duties imposed upon the Maryland Society for the Prevention of Cruelty to Animals of Baltimore City, the said society is required quarterly to furnish to the City Comptroller an itemized account showing the work done and expenditures of money for doing the same, and it is further provided and agreed that the method of destroying dogs shall be subject to the inspection and approval of the Mayor."

Mayor Hayes renewed this agreement on June 29, 1901, for three years.

Mayor Timanus renewed it on June 29th, 1904, for three years.

Mayor Mahool renewed it on June 26th, 1907, for three years from June 29th, 1907.

While this last renewal of the agreement was pending the City Council passed another ordinance on this subject. The ordinance is No. 138, approved June 3, 1908. This ordinance repealed sections 19 and 23 of the ordinance of 1898, and reordained them with amendments.

Section 23, as reordained, is as follows:

"The Mayor is authorized and empowered to contract for and on behalf of the Mayor and City Council of Baltimore, pursuant to the provisions of sections 14 and 15 of the City Charter, for the seizure and destruction of such animals of the dog kind as shall from time to time be found running at large within the limits of the city of Baltimore; provided, however, that such contract shall not be for a longer period than three years, unless renewed, nor for a greater contract price annually than the sum of $2,000 and the net amount of money received by the Collector of Water Rents and Licenses for license fees and fines remaining after the payment of the expenses incurred by him in carrying out his duties under sections 19, 20 and 21 of this article; provided, however, that any excess of money paid the Collector of Water Rents and Licenses under sections 20 and 21 of this article, after paying the expenses incurred by such contractor, shall revert to the City Treasury."

As a consequence of said ordinance No. 138, approved June 3rd, 1908, the following agreement was entered into between Mayor Mahool and the society:

"This agreement, made this 25th day of March, in the year 1909, by and between J. Barry Mahool, Mayor of the City of Baltimore, of the first part, and the Maryland Society for the Prevention of Cruelty to Animals of Baltimore City, of the second part.

"Whereas, an agreement, was hitherto made between the parties hereto relating to the seizure of unlicensed animals of the dog kind running at large within the limits of the city of Baltimore, in accordance with the provisions of an ordinance of the Mayor and City Council of Baltimore, approved June 15th, 1898, entitled "An ordinance to repeal sections 19 to 35, inclusive, of Article 33 of the Baltimore City Code of 1893, and to re-enact sections 19, 20, 21, 22, 23 and 25 with amendments."

"And whereas, said agreement, which bears date June 29, 1898, and purports to be operative for a period of three years from its date, has from time to time and under the authority conferred by said ordinance, been renewed for successive periods of three years each, the last of said renewals bearing date June 26, 1907, and covering a period of three years accounting from June 29, 1907.

"And whereas, by the term of Ordinance No. 138 of the Mayor and City Council of Baltimore, approved June 3, 1908, and entitled 'An ordinance to repeal sections 19 and 23 of Article 33 of the Baltimore City Code of 1893, title "Water Rents and Licenses," subtitle "Dogs," as said sections were repealed and reordained by Ordinance No. 96 of the Mayor and City Council of Baltimore, approved June 15, 1898, and to reordain the same with amendments, and to add a new section to said article of the Baltimore City Code to follow immediately after section 19, and to be known as section 19A,' certain amendments were made to the said ordinance of 1898, under which said original contract was executed, and because of said amendments certain modifications and changes to the said existing contract between the parties hereto have become desirable or necessary, wherefore this agreement, which is supplementary to the said existing contract, is made.

"Now, therefore, this agreement witnesseth, That in consideration of the premises, and the sum of five dollars paid by the party of the first part to the party of the second part, it is hereby agreed that the said Maryland Society for the Prevention of Cruelty to Animals of Baltimore City shall seize, or cause to be seized, and shall destroy all animals of the dog kind as shall from time to time be found running at large within the limits of the city of Baltimore, as the said term 'running at large' is defined in the said Ordinance No. 138, approved June 3, 1908, such seizure and destruction, and all steps, notices and other matters incident thereto to be in strict conformity to the provisions and requirements of said Ordinance No. 138.

"It is further agreed, That in consideration of the performance of said duties, the Mayor and City Council of Baltimore shall annually, accounting from January 1st, 1909, pay to the said party of the second part during the continuance of this agreement, the sum of twelve thousand dollars ($12,000), provided such sum does not in any year exceed the aggregate of two thousand dollars ($2,000) and the net amount of money received by the Collector of Water Rents and Licenses for license fees and fines remaining after the payment of the expenses incurred by him in the carrying out of Sections 19, 20 and 21 of Article 33 of the Baltimore City Code of 1893. In case the said sum of twelve thousand dollars should in any year exceed the aggregate of the two sums last mentioned, then the aggregate of the two sums last mentioned shall be the compensation of the said party of the second part during that year. Provided further, however, that in no event shall the said party of the second part receive for the performance of its said duties in any year any sum in excess of the expenses incurred by it in performing such duties during such year, and if in any year the expenses so incurred by the party of the second part shall be less than the compensation hereinbefore provided, then the balance shall revert to the City Treasury. The compensation herein provided for shall only be paid to the party of the second part upon duly authenticated vouchers from time to time presented.

"This supplementary agreement shall continue in force until the expiration of a period of three years, accounting from the 29th day of June, 1907, which is the date of the last renewal of the

said original contract to which this agreement is supplementary; and except as herein modified, the said original contract, renewed as aforesaid, shall continue in full force and effect as therein provided."

On December 10, 1910, Mayor Mahool renewed the agreement with the Society for three years from January 1, 1911.

I have set forth in full the ordinances and the agreement that has been made thereunder between the Mayor of the City and the Society, so as to show exactly what can be done and what has been done in the matter. There is no ambiguity either as to the meaning of the ordinances or as to the agreement made by the Mayor in pursuance thereof. The ordinances authorizes the Mayor on behalf of the Mayor and City Council of Baltimore, pursuant to sections 14 and 15 of the City Charter, which requires advertisement for bids and an awarding to the lowest responsible bidder, to contract for the seizure and destruction of dogs running at large in the city, for a period, not longer than three years, and for a price not greater annually than the sum of $2,000 plus the net amount received for license fees and fines provided any excess after paying the expenses incurred by the contractor, shall revert to the City.

Under the agreement above set forth the Society agrees to seize and destroy all animals of the dog kind from time to time running at large within the limits of the City, and the City agrees to pay to the Society the sum of $12,000 annually, provided said sum does not exceed $2,000 and the net amount of money received from the licenses and fines, and if it does, the aggregate of said two sums shall be the compensation of the society; but the society is never to receive in one year a sum in excess of its expenses in performing its duties under the contract. The last renewal of said agreement was for three years from January 1, 1911, so that it expires January 1, 1914, a little more than one month from date of this opinion. The sum of $12,000 has been increased by a subsequent agreement to $14,500. And in no year has the sum paid the Society equaled the amount received by the city from the license fees and fines. There can be no doubt as to the meaning of the ordinances, nor can there be any doubt as to the meaning of the contract made in pursuance thereof. The language of both is perfectly plain. But in making the contract it is admitted by the defendants that no attempt was made to comply with the requirements of sections 14 and 15 of the Charter. So that if the agreement between the Mayor and the Society is an attempt to make what it purports to be, viz: a contract, and sections 14 and 15 are applicable thereto, it is invalid and the plaintiff is entitled to relief.

The defendants, however, contend that there is and can be no contractual relation between the City and the Society in regard to the subject that the agreement deals with. They contend that the catching and destroying the dogs in the City is a subject within the police power, and that in respect to that subject no contract of the kind indicated by the agreement can be made. That the effect of the ordinances and agreement was not and could not be to create a contract, but only operates an an appointment or commission to the society as an officer or agent of the City to carry out the duties set forth.

To support this contention the counsel for the Society quoted numerous passages from text writers, for the purpose of showing that a municipality could not divest itself of or contract away its police power. I will take as an example a quotation from 28 Cyc. p. 696 b. As the State may not, by any law of contract, surrender or restrict any portion of its sovereignty which it holds in sacred trust for the public weal, so a municipality as a governmental agency, acting and bound always to act as trustee of the powers delegated to it, may not, by contract, license or by-law, surrender or restrict any portion of its police power conferred upon it." There is no doubt of this doctrine and numerous authorities could be and have been referred to to support it. It is an established principle of constitutional law that a State cannot relinquish any of its powers of sovereignty. Among these is the police power, the power to do what is necessary to safeguard the public health, the public safety and the public morals. And in the exercise of this power contractual rights and property rights must yield. But does the agreement here under

consideration conflict in any way with this principle? I do not think that it does. It is not an attempt by the municipality to part with its police power; it is not relinquishing its police power, it is simply carrying it out. Contracts of this character have been repeatedly recognized and upheld by the courts. There is no distinction in principle between a contract by the City under its police power to destroy dogs, and a contract under the police power to dispose of the garbage of the city. In both cases the property of the individual may be taken to insure the public safety or the public health.

Hagerstown vs. Witmer, 86 Md. 293.

Why in reason should not a State or City have the power to contract with a person to do work which is necessary to be done under the police power, as well as to commission or appoint some one to do it. The power in a city to contract in regard to a subject of this character may result in a far more economical and efficient way of doing the work, that by having it done through its own officers or servants. The case we are considering may be an illustration of this.

In the same volume of Cyc. No. 28, on page 717 C., it is said: "Garbage, refuse and filth, are also within the rules relating to municipal police power over nuisances, under its power not only to abate but to prevent nuisances, *a municipality may by contract* provide for removal * * * *and give a monopoly thereof by contract for a period of years.*"

In the case of State vs. Orr. 68 Conn. 110, where an ordinance was passed giving the Board of Health of Bridgeport the power to contract to remove garbage, Judge Baldwin said: Under these provisions, the Board of Health might contract with a single person to collect and remove garbage from the entire city or with several persons to collect and remove it from as many different portions of the City. In this case a man was found guilty of collecting garbage without a license and fined.

In the case of Walker vs. Jameson, 140 Ind. 592, the City of Indianapolis through its Board of Public Works by contract, clothed James H. Woodward with the exclusive right and obligation to remove the garbage from the premises of all persons in said City.

Woodward with the consent of the City assigned the contract to Jameson, who successfully enjoined Walker from interfering with and removing such garbage.

In the case of State vs. Payson, 47 La. An. 1029, it is stated in the headnote: "The corporation may contract with the highest bidder in order to remove and destroy under certain regulations the offals that are annoying to health."

In the case of Coombs vs. MacDonald, 43 Neb. 632, a contract that gave to MacDonald the exclusive right to collect the garbage in Omaha was upheld, because it was made under the police power. Had it been a monopoly that would tend to restrict trade it would have been invalid.

In the case of Atlantic City vs. Abbott, Prosecutor, it was held that a city ordinance which limits the use of the public streets for the collection and disposal of offal, garbage or refuse matter that may become dangerous to the public health, to the duly authorized contractor of the city, is valid as an exercise of police power, if passed in good faith to safeguard the public health.

In the case of California Reduction Company vs. Sanitary Reduction Works, 199 U. S. 306, the Supreme Court of the United States upheld a contract made by the Board of Supervisors of San Francisco for the period of fifty years with one Sharon to remove the refuse matter in said City. Sharon assigned the contract to the Sanitary Reduction Works.

Among the things to be removed we find the following: "To remove and dispose of all dogs killed at the pound, and all animals impounded and not redeemed by the owners thereof, and which are valueless and cannot be sold, etc."

Indeed, in none of these cases is the power to make such a contract questioned at all. The right to contract for the removal of garbage is recognized in the case of Packard vs. Hayes, 94 Md. 233. The lighting of the streets is done by the municipality in the exercise of its police power to insure the safety of its people and no question has ever been raised as to the power of the City to contract with gas or electric companies for that purpose.

Baltimore vs. Keyser, 72 Md. 115.

300 ·

Indeed, there seems to be no good reason why a city could not contract for the removal of dogs as well as upon any other subject pertaining to the public welfare, for water, for light, for the construction of sewers, the paving of streets, the removal of garbage, or for the abatement or prevention of any kind of nuisance, whether dogs, cats, rats, mosquitoes, or microbes, that the public health, safety, comfort or well-being might demand.

The ordinances authorized the Mayor to make a contract, and the agreement with the Society would have created contractual relations between it and the City had the requirements of sections 14 and 15 of the Charter been complied with. At the hearing of the case I was inclined to the opinion that the original agreement made in pursuance of the ordinance of 1898 was not within the provisions of sections 14 and 15, but now, after further consideration, in view of the broad language of these sections, and the amount of money necessarily spent in the work done, and the intent shown by the Charter to safeguard the expenditure of the City's money, I think the original agreement was within these sections even before the ordinance of 1908 was passed.

But, if not, I see no valid reason why the Mayor and City Council by ordinance could not as they have done restrict the authority of the Mayor to contract by requiring a compliance therewith.

But how does the contention of the defendants that the Mayor has not the power to contract help their case? If the ordinances do not confer that power upon him they confer none. Certainly they do not authorize him to deputize any one to do the work that the Society has been doing, and to pay out annually therefor the sum of $14,500. If the authority which is given the Mayor, in the way it is given, is invalid, it cannot have the effect of authorizing him to act in an entirely different manner.

Nor does there appear to be anything in the argument that there is no consideration for the agreement, because there is no profit to the Society. The Society gets annually $14,500, or as much of it as it may spend in carrying out the work, and the City gets the benefit of the Society's services.

An agreement to do certain work at cost is just as much of a contract as an agreement to do the work for 10 per cent. in addition to cost or for a fixed sum. The essential elements of a contract are present in all three cases.

Nor do I see anything in the contention that the contract cannot be given out to competitive bidding because no matter what the lowest bidder may agree to do the work for he can only receive his actual expenses. He can bid for the work at a figure beyond which he will receive nothing, although his actual expenses may exceed that sum.

There is doubtless a considerable margin in the amount of actual expenses that may be incurred in doing this work, dependent upon salaries paid and other disbursements. It might very well be that it would be to the public interest to allow the Mayor in his discretion without competition to award the contract for doing this work to the person best equipped and qualified to do it. That is a matter for the Legislature and the City to determine, not for the Court.

I am of the opinion that the agreement between the Mayor and the Society in invalid, because there has been no compliance with the requirements of sections 14 and 15 of the City Charter.