**NEW YORK STATE TRAWLERS ASSO-
CIATION, Lauren Ridge and Duncan
Ridge, Plaintiffs–Appellants,**

v.

**Thomas C. JORLING, Commissioner, New
York State Department of Environmen-
tal Conservation, Defendant–Appellee.**

No. 569, Docket 93–7571.

United States Court of Appeals,
Second Circuit.

Argued Nov. 1, 1993.

Decided Jan. 18, 1994.

Leon Friedman, New York, NY (Erica Horwitz, Richard Ware Levitt, Nicholas Kaizer, Lefcourt & Dratel, of counsel), for plaintiffs-appellants.

Gregory J. Nolan, Assistant Attorney General, New York, NY (Robert Abrams, Attorney General, Andrea Green, Deputy Solicitor General, Leslie Allan, Assistant Attorney General, of counsel), for defendant-appellee.

Before: OAKES, KEARSE and ALTIMARI, Circuit Judges.

OAKES, Senior Circuit Judge:

## I. BACKGROUND

In July 1990, New York amended its Environmental Conservation Law to prohibit anyone owning or operating or on board a vessel equipped with trawling nets from taking, landing, or possessing lobsters in Long Island Sound. N.Y.Envtl.Conserv.Law § 13–0329(1) and (2)(c) (McKinney Supp.1993) (the "Amendments"). The Amendments became effective on January 1, 1991.

On April 4, 1991, the New York State Trawlers Association, Lauren Ridge, and Duncan Ridge[1] (the "Trawlers") brought suit against Thomas C. Jorling, Commissioner of the New York State Department of Environmental Conservation. The Trawlers alleged that the Amendments deprived them of their rights under the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution. The Trawlers also alleged that the Amendments violated the Constitution's Commerce and Bill of Attainder Clauses. To remedy these alleged deprivations, the Trawlers brought suit pursuant to 42 U.S.C. § 1983 (1988 & Supp.1991) seeking temporary and permanent relief enjoining Jorling, as head of the Department of Environmental Conservation (the "DEC"), from enforcing the Amendments.

On April 17, 1991, the United States District Court for the Eastern District of New York, Charles P. Sifton, *Judge,* denied the Trawlers' motion for a preliminary injunction. *New York State Trawlers Ass'n v. Jorling,* 764 F.Supp. 24 (E.D.N.Y.), *aff'd,* 940 F.2d 649 (2d Cir.1991). On May 7, 1993, the district court filed a Memorandum and Order granting Jorling's motion for summary judgment and dismissing the complaint. *New York State Trawlers Ass'n v. Jorling,* No. CV–91–1180 (E.D.N.Y. May 7, 1993) ("Or-

der"). The Trawlers filed a timely notice of appeal on June 7, 1993. We now affirm.

## II. REGULATION OF LOBSTER FISHERIES IN LONG ISLAND SOUND

Section 13–0329 of New York's Environmental Conservation Law governs the taking of lobsters in New York waters. This section provides for both resident and non-resident permits to take lobsters. Resident and non-resident permits are further classified into commercial and non-commercial permits. N.Y.Envtl.Conserv.Law § 13–0329(1) and (2).

Although traditionally caught with lobster pots, lobsters may also be caught with trawl nets dragged close to or along the bottom. In the past, it was not profitable to trawl specifically for lobsters. Instead, trawlers[2] would trawl for finfish. Occasionally, however, a trawlers' net would inadvertently fall close to, or on, the bottom and consequently ensnare some lobsters.

Prior to January 1, 1983, New York State permitted trawlers with lobster permits to keep and sell all the lobsters[3] they caught while trawling for finfish. Gradually, however, the New York legislature became concerned that lobsters caught by trawls were suffering higher mortality rates than lobsters caught by pots or traps. Eventually, these concerns led the legislature to limit trawlers to 100 lobsters per day. N.Y.Envtl.Conserv.Law § 13–0329(1) and (2)(c) (McKinney 1984). This limit was set with the hope of discouraging trawling specifically for lobsters while allowing trawlers to keep lobsters that they might inadvertently catch. The legislature later became concerned, however, that this limit failed to discourage directed trawling for lobsters:

> Contrary to the letter and spirit of the law, some trawl boats are being fitted with

---

**1.** Plaintiff Thomas MacGregor later joined the action by amendment of the complaint dated Aug. 11, 1992.

**2.** A trawler is, for purposes of the statute, "a person holding a commercial permit who is a person operating or owning or on board a dragger or any vessel used to operate any net defined as a trawl in section 13–0341 of this title" N.Y.Envtl.Conserv.Law § 13–0329(1). A trawl is

defined as "a net which is towed or dragged through the water column, capturing fish by straining the water, but shall not include a seine which is used to encircle fish." N.Y.Envtl.Conserv.Law § 13–0341 (McKinney 1984).

**3.** Within legal limits as to size of the lobsters and the condition of their shells. *See* N.Y.Envtl.Conserv.Law § 13–0329(5) (McKinney 1984 & Supp. 1993).

equipment designed specifically to take lobsters. The Long Island Sound lobster stocks may be unable to support any significant increase in trawl catches.

Scientific studies have shown that trawler activity in key lobster beds can significantly increase mortality and cull (damage) rates among lobsters. This is especially true during molting periods, when lobsters · shed their shells to grow and are soft and vulnerable.

Memorandum of Senator Lavalle and Assembly Member DiNapoli (undated). Finally, in July of 1990, the legislature amended N.Y.Envtl.Conserv.Law § 13–0329(1) and (2)(c) to prohibit trawlers from taking, landing, or possessing lobsters altogether. The Amendments became effective January 1, 1991. This litigation ensued shortly thereafter.

## III. DISCUSSION

### A. Standard of Review

We will affirm a grant of summary judgment only where *de novo* review of the record and evidence in a light most favorable to the non-moving party reveals that there exists no genuine issue of material fact. *Viacom Int'l Inc. v. Icahn,* 946 F.2d 998, 1000 (2d Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1244, 117 L.Ed.2d 477 (1992). We note that the existence of a factual dispute alone will not warrant reversal, however. We will reverse a grant of summary judgment only where the dispute is regarding a material fact and is "genuine." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986) ("the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact") (emphasis in original). A dispute concerning a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. at 2510; *Lang v. Retire-*

*ment Living Publishing Co., Inc.,* 949 F.2d 576, 580 (2d Cir.1991).

### B. Dormant Commerce Clause

■ The Trawlers challenge the constitutionality of the Amendments under the so-called "dormant" or "negative" Commerce Clause. Trawlers' Brief at 23–32.

■ The United States Constitution ascribes to Congress the power "[t]o regulate Commerce ... among the several States." U.S. Const. art. I, § 8, cl. 3. Ascription of this power to Congress limits, by negative implication, the power of the States to interfere with interstate commerce. *See, e.g., Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources,* — U.S. —, —, 112 S.Ct. 2019, 2023, 119 L.Ed.2d 139 (1992). Provided a state does not discriminate against non-residents, however, it may impose incidental burdens on interstate commerce when exercising its police power to promote safety or general welfare. *See, e.g., Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970); Laurence Tribe, American Constitutional Law (2d ed. 1988) §§ 6–3 to 6–5, 408 ("State regulation affecting interstate commerce will be upheld if (a) the regulation is rationally related to a legitimate state end, and (b) the regulatory burden imposed on interstate commerce, and any discrimination against it, are outweighed by the state interest in enforcing the regulation.") (citations omitted).

■ Although Envtl.Conserv.Law § 13–0239 differentiates between New York residents and non-residents for the purpose of issuing lobster permits, its prohibition of the possession or taking of lobsters by trawlers applies equally to resident and non-resident trawlers. In addition, nothing in Envtl.Conserv.Law § 13–0329 requires non-resident trawlers to violate the law of another jurisdiction. Further, the Amendments neither advance protectionist interests nor shift burdens from New York to other states. We conclude that the statute regulates evenhandedly.[4] We therefore determine first whether

---

**4.** We note that the Trawlers' reliance on *Atlantic Prince Ltd. v. Jorling,* 710 F.Supp. 893, 902 (E.D.N.Y.1989) (declaring New York statute prohibiting boats over 90 feet in length from fishing in New York waters unconstitutional under the Dormant Commerce Clause), is misplaced. *See*

the regulation is reasonably related to a legitimate state end and second whether the burden on interstate commerce imposed by the regulation outweighs the state's interest in enforcing the regulation. The Supreme Court in *Pike* put it this way:

> Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.

*Pike,* 397 U.S. at 142, 90 S.Ct. at 847. Summary judgment is appropriate where no reasonable factfinder could find that the statute's "incidental burdens on interstate commerce" are "clearly excessive in relation to the local benefits." The "incidental burdens" are the burdens on interstate commerce that exceed the burdens on intrastate commerce. *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 471–72, 101 S.Ct. 715, 727–28, 66 L.Ed.2d 659 (1981).

■ The regulations at issue in this case are rationally related to advancing a legitimate state interest. The protection of the environment and conservation of natural resources—including marine resources are areas of "legitimate local concern." *Id.* at 471, 101 S.Ct. at 727. *See Maine v. Taylor,* 477 U.S. 131, 140, 106 S.Ct. 2440, 2448, 91 L.Ed.2d 110 (1986) (upholding facially discriminatory Maine statute prohibiting the importation of out-of-state baitfish); *Southview Assocs., Ltd. v. Bongartz,* 980 F.2d 84, 107–109 (2d Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1586, 123 L.Ed.2d 153 (1993). As Judge Sifton pointed out, the rationality of the legislation may be supported by ample evidence indicating that the mortality rate to lobsters—particularly to the younger ones—from trawling is greater than that occurring to lobsters in the pot fishery. *Trawlers,* 764 F.Supp. at 27. Even the study most favorable to the plaintiffs indicated that during certain months of the year, the damage and mortality rates of lobsters caught by trawl—particularly in so-called "directed" trawling

operations—are significantly higher than the rates of those caught by trap. Order at 9. We are reminded, as was Judge Sifton, that "the judiciary may not sit as a superlegislature to judge the wisdom ... of legislative policy determinations." *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976).

■ A reasonable factfinder could not find that the Amendments impose substantial or significant burdens on interstate commerce. The Trawlers argue that, under the Amendments, Connecticut trawlers with non-resident permits will be required to travel greater distances. Trawlers' Brief at 23–32. The Trawlers, however, fail to point to any evidence of actual hardship to Connecticut trawlers. Instead, the Trawlers rely on the affidavit of Connecticut fisherman Thomas MacGregor that presented hypothetical situations in which a Connecticut trawler might be burdened by the Amendments. MacGregor did not assert that he actually catches lobsters in Connecticut waters from which he cannot return directly to his home port without crossing New York waters. Indeed, there is no evidence that any Connecticut trawler actually catches lobsters in Connecticut waters that would require the trawler to cross New York waters in order to return directly to his or her home port. *See* MacGregor Aff. of Sept. 28, 1992, Joint Appendix at 524.

Furthermore, it appears that if any burdens are imposed on Connecticut trawlers, they are similar to burdens that already exist under different aspects of Section 13–0329. Prior to the Amendments, for example, a Connecticut trawler was required to obtain a permit to fish for lobsters in New York waters. Presumably, a Connecticut trawler without a permit would have been subject to the same burden that the Trawlers argue a Connecticut trawler will now be subject to. Although Connecticut trawlers could ameliorate this burden in part by applying for a permit to take lobsters from New York wa-

Trawlers' Brief at 32. *Atlantic Prince* invalidated legislation found to discriminate against out-of-state fishing operations. By contrast, even the Trawlers concede that "[t]he law in question falls

in the 'incidental' category, that is, the discrimination in question does not favor in-state economic interests against out-of-state interests." *Id.* at 24.

ters, they could not avoid the burden completely. For example, although Connecticut trawlers could obtain a permit, the number of lobsters they could take or possess under the permit was limited to 100. Thus, a Connecticut trawler who possessed more than 100 lobsters would also be required to skirt New York waters.

In addition, a reasonable factfinder could not have found that whatever incidental burdens exist were "clearly excessive" in relation to the local benefits. Even studies relied upon by the Trawlers showed that there is a significant difference between mortality rates amongst lobsters caught by trawl nets and lobsters caught by pots. The disparity between mortality rates is even greater during the molting season, when lobsters shed their shells. Given the small, if not nonexistent, incidental burdens on interstate commerce and the significant local benefits, a reasonable factfinder could not have found that incidental burdens on interstate commerce were "clearly excessive" in relation to, or otherwise outweighed, the benefits of discouraging directed trawling for lobsters.

### C. Other Constitutional Challenges

The Trawlers also challenge the Amendments as unconstitutional under the Equal Protection Clause, the Due Process Clause, and the Bill of Attainder Clause. Under each of these clauses, the Trawlers essentially argue that the Amendments do no more than favor one in-state economic group—the pot fishermen—over another—the trawl fishermen. We will address this argument with respect to each clause.

#### 1. Equal Protection Challenge

■ The Trawlers argue that the Amendments discriminate against trawlers, depriving them of their right to equal protection of the laws. They support this argument with citation to *United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 534, 93 S.Ct. 2821, 2825, 37 L.Ed.2d 782 (1973), and *Smith v. Cahoon*, 283 U.S. 553, 566–67, 51 S.Ct. 582, 586–87, 75 L.Ed. 1264 (1931).

■ The creation of economic classifications by legislation is ordinarily entitled to substantial deference. As the Supreme Court has written, "[s]tates are accorded wide latitude in the regulation of their local economies under the police powers and rational distinctions may be made with substantially less than mathematical exactitude." *Dukes*, 427 U.S. at 303, 96 S.Ct. at 2516; *see also FCC v. Beach Communications, Inc.*, — U.S. —, —, 113 S.Ct. 2096, 2102, 124 L.Ed.2d 211 (1993) ("a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data"); Tribe, *supra* at § 16–2, 1441 (economic regulation is constitutional so long as the purpose behind the regulation is legitimate). Indeed, such legislation is entitled to "almost the equivalent of a strong presumption of constitutionality." *Dieffenbach v. Attorney General of Vermont*, 604 F.2d 187, 195 (2d Cir. 1979); *see also Image Carrier Corp. v. Beame*, 567 F.2d 1197, 1202–03 (2d Cir.1977), *cert. denied*, 440 U.S. 979, 99 S.Ct. 1785, 60 L.Ed.2d 239 (1979). To prevail under the equal protection claim, therefore, the Trawlers would be required to show that the Amendments are clearly arbitrary and unreasonable, with no rational relation to a legitimate state interest. A defendant to such a claim, however, is entitled to summary judgment if he or she can show that there exists no factual dispute on the basis of which a reasonable factfinder could conclude that the challenged legislation was "clearly arbitrary and unreasonable." This standard is met where, for example, a reasonable factfinder would conclude that the legislation was rationally related to a legitimate state interest. This standard does not require a showing that the legislation was *the best* means of promoting a legitimate state interest. Rather, the standard is met by a showing that the challenged legislation was *a reasonable* means of promoting the interest. In making such a determination a little legislative approximation is permissible in the interest of "legislative convenience." *Vance v. Bradley*, 440 U.S. 93, 109, 99 S.Ct. 939, 948, 59 L.Ed.2d 171 (1979).

As we have said, there is no doubt that the protection of the lobster fishery in the Long Island Sound is a legitimate state interest. The interest of a state in regulating the

taking of its fish and wildlife resources has been long established. *See, e.g., New York ex rel. Kennedy v. Becker,* 241 U.S. 556, 562–64, 36 S.Ct. 705, 707–08, 60 L.Ed. 1166 (1916). Legislation protecting the New York lobster fishery, for example, has been in place at least since the New York Conservation Act of 1911. Further, there exists no factual dispute that would lead a reasonable factfinder to conclude that the Amendments are *not* rationally related to a legitimate state interest. Five studies finding increased mortality rates amongst lobsters taken by trawl nets were available to the legislature. Indeed, staff of the Amendments' sponsors attended an informational meeting with DEC at which they were informed of the existence and results of these studies. The bill jacket for Envtl.Conserv.Law § 13–0329 indicates that the legislation was intended to "reduce mortality and damage rates of lobsters." In addition, a memorandum written contemporaneous to the Amendments and authored by the sponsors of the Amendments indicates that the sponsors were concerned with protecting the lobster population, not discriminating against trawlers for some illegitimate reason. Thus, the district court properly granted summary judgment in favor of Jorling because a reasonable jury could not find that the Amendments were *not* related to a legitimate state interest.

■ The Trawlers rely on *United States Dep't of Agric. v. Moreno* to argue that New York may not enact legislation that simply promotes one economic interest or group over another. *Moreno,* however, is inapposite to this case. *Moreno* involved a regulation that denied food stamps to households containing unrelated members on the basis that the classification was "wholly without any rational basis." *Moreno,* 413 U.S. at 538, 93 S.Ct. at 2827. Indeed, the classification seemed irrational because it disentitled only those so in need of aid that they could not afford to alter their living arrangements to retain eligibility. The Amendments at issue in this case, by contrast, are rationally related to a legitimate state interest. Further, the Amendments do not completely disqualify trawlers from fishing for lobsters— trawlers are disqualified from fishing for lobsters only if they do so by trawling or by the use of boats with trawls. While *Moreno* does stand for the proposition that "a bare [legislative] desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest," *id.* at 534, 93 S.Ct. at 2825, there is nothing in this record to indicate that harming the trawler fishermen was the sole purpose of the Amendments.

■ The Trawlers also rely on *Smith v. Cahoon.* Although this case is closer to the mark in that it found arbitrary an economic distinction between transporters of some food products and those of others, *Cahoon,* like *Moreno,* is not controlling. To analogize *Cahoon* to this case, the Trawlers must state "the policy justification offered for the law [at issue here]—environmental protection—is simply not plausible." Trawlers' Brief at 38. They argue that the ban on their possession of lobsters does not advance the goal of insuring that trawls shall not injure the resource because "the nets will continue to be used in the same manner as they have always been used and in the same places in the Sound." *Id.* The New York Legislature, however, may have thought otherwise. As Judge Sifton pointed out, the legislature was concerned with some trawler fishermen directing their efforts at catching lobster. Indeed, affidavits to this effect were submitted in support of summary judgment. *See* Joint Appendix at 30 (omitted in published opinion except to say that "the legislature eliminates incentives to seek out lobsters deliberately and encourages commercial fisherman [sic] to take steps to avoid the time-consuming process of returning lobsters caught to the ocean floor unharmed." *Trawlers,* 764 F.Supp. at 27). Because a reasonable factfinder could not conclude that this purpose was "implausible," *Cahoon* is not controlling.

### 2. Due Process

■ The Trawlers argue that the Amendments deprive them of a property interest in trawling for lobsters without due process of law, a substantive due process argument. The Trawlers also argue that the Amendments subject them to impermissible pejorative presumptions. These deprivations, the Trawlers argue, violate the Due Process

Clause of the Fourteenth Amendment. Trawlers' Brief at 43–47.

■■■■ The Amendments do not deprive trawlers of a property interest. Persons engaged in an industry affecting the public interest may be subject to state regulation, including licensing schemes. One's interest in a license may be a property interest cognizable by the Due Process Clause of the Constitution, even after the demise of "Allgeyer–Lochner–Adair–Coppage constitutional doctrine" as explicated in *Lincoln Fed. Labor Union No. 19129 v. Northwestern Iron and Metal Co.*, 335 U.S. 525, 535–36, 69 S.Ct. 251, 256–57, 93 L.Ed. 212 (1949). *See Schware v. Board of Bar Examiners*, 353 U.S. 232, 238–39, 77 S.Ct. 752, 755–56, 1 L.Ed.2d 796 (1957) ("A State cannot exclude a person from ... any ... occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause[s] of the Fourteenth Amendment."); *Lebbos v. Judges of Superior Court, Santa Clara County*, 883 F.2d 810, 818 (9th Cir.1989) ("Substantive due process 'protects a liberty or property interest in pursuing the "common occupations or professions of life." ' "); *see also Goldberg v. Kelly*, 397 U.S. 254, 262 n. 8, 90 S.Ct. 1011, 1017 n. 8, 25 L.Ed.2d 287 (1970) (citing Charles Reich, *The New Property*, 73 Yale L.J. 733 (1964)); Tribe, *supra* at §§ 10–9 and 10–10.

■■■■ Constitutional cognizance of a property interest in a vocational license requires states to administer licensing schemes fairly. That is, a state may not arbitrarily deny a person a permit to take lobsters nor may it capriciously revoke a person's permit to take lobsters. *Lebbos*, 883 F.2d at 818. The scope of the license and the very existence of the license are not guaranteed by the Due Process Clause, however. The state may alter the terms of the licenses (or eliminate the licenses altogether) so long as the alteration (or elimination) is rationally related to a legitimate state interest such as "the public health, safety, morals, or general welfare." *Id.* New York, therefore, is free to regulate not just the number or size of lobsters that are taken from its waters but the means by which lobsters are taken, so long as the regulations are rationally related to a legitimate state interest. As discussed above, the Amendments in this case were rationally related to a legitimate state interest—the conservation of marine resources in Long Island Sound.[5] *See Interport Pilots Agency, Inc. v. Sammis*, 14 F.3d 133, ——-—— (2d Cir. 1994).

■■■■ We also reject the Trawlers' second due process challenge—that the Amendments impose an unconstitutional irrebuttable presumption upon the owners and operators of trawlers. The Supreme Court has recognized that irrebuttable presumptions imposed on people to deprive them of fundamental constitutional rights are "disfavored under the Due Process Clauses of the Fifth and Fourteenth Amendments." *Vlandis v. Kline*, 412 U.S. 441, 446, 93 S.Ct. 2230, 2233, 37 L.Ed.2d 63 (1973); *Stanley v. Illinois*, 405 U.S. 645, 658, 92 S.Ct. 1208, 1216, 31 L.Ed.2d 551 (1972); Tribe, *supra* at § 16–34. The Amendments, however, do not act to impose an irrebuttable presumption on trawlers that deprives them of a fundamental constitutional right. The Amendments do not prohibit people who own or operate a trawler from receiving a permit to take lobsters. On the contrary, the Amendments explicitly provide that owners and operators of trawlers may take lobsters provided they do so from a vessel on which there are no trawls or to which no trawls are attached or which do not use trawls. On this point it is useful to contrast the Amendments with N.Y.Envtl.Conserv.Law § 13–0329(8) which provides:

> A person shall not be issued a permit to take or land lobsters in New York state if said person had a license or permit to take or land lobsters in another state which has been suspended or revoked for an illegal act which is also an illegal act in New York state until such suspension or revocation has been terminated.

---

5. Also, and again as discussed above, the Amendments do not bar trawlers from fishing for other fish or even from fishing for lobsters with pots or traps so long as they do so from vessels with no trawls.

This provision creates a presumption that attaches to a particular person.[6] The Amendments, by contrast, reflect a legislative judgment concerning appropriate methods for the taking of lobsters.

### 3. Bill of Attainder

 Finally, the Trawlers argue that the Amendments violate the Constitution's prohibition on bills of attainder. Trawlers' Brief at 40–43. That prohibition provides, "No State shall ... pass any Bill of Attainder." U.S. Const. art. I, § 10, cl. 1; *see generally McMullen v. United States,* 989 F.2d 603 (2d Cir.) (discussing the history of bills of attainder and their prohibition), *cert. denied,* —— U.S. ——, 114 S.Ct. 301, 126 L.Ed.2d 249 (1993).

A bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Administrator of Gen. Servs.,* 433 U.S. 425, 468, 97 S.Ct. 2777, 2802, 53 L.Ed.2d 867 (1977). The Supreme Court has applied three tests to determine whether a statute imposes "punishment" of the type prohibited by the Bill of Attainder Clause: (1) a traditional test; (2) a functional test; and (3) a motivational test. *See id.* at 473–482, 97 S.Ct. at 2805–10.

The Amendments do not impose punishment under any of these tests. Under the traditional test, statutes imposing " 'punishment traditionally judged to be prohibited by the Bill of Attainder Clause,' including death, imprisonment, banishment, punitive confiscation of property by the sovereign and, in more recent times, laws 'barring designated individuals or groups from participation in specified employments or vocations' " have been held to violate the prohibitions on Bills of Attainder. *McMullen,* 989 F.2d at 607 (quoting *Nixon,* 433 U.S. at 474, 475, 97 S.Ct. at 2806) (citation omitted); *see* Tribe, *supra* at §§ 10–4 and 10–5. The Amendments do not confiscate the property of trawlers, only regulate the manner in which it may be used. In addition, the Amendments do not bar

trawlers from their occupation: trawlers may continue to engage in trawling for other species of fish and trawlers may even continue to fish for lobster, provided there are no trawls "on board, attached to in any way, or being used by" their vessel. N.Y.Envtl.Conserv.Law § 13–0329(1) and (2)(c). Under the functional test, a court will analyze "whether the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes." *Nixon,* 433 U.S. at 475–76, 97 S.Ct. at 2806–07 (footnote omitted). As we discussed above, the Amendments are rationally related to New York's interest in conserving its marine resources. Under the motivational test, a court will inquire "whether the legislative record evinces a [legislative] intent to punish." *Nixon,* 433 U.S. at 478, 97 S.Ct. at 2808. From what little legislative record there is, it is clear that the legislature intended by enacting the Amendments to protect the lobster population from directed trawling; nothing in the legislative record suggests that the legislature intended to punish trawlers.

### IV. CONCLUSION

In closing, we are reminded of the words of F. Scott Fitzgerald. In the final passages of *The Great Gatsby,* Nick sits on the beach looking out over the Long Island Sound. While contemplating the Sound, Nick reflects upon the "fresh, green breast of the new world" as it must have appeared to its first explorers. Not long ago, it would indeed have seemed that the Sound "year by year recedes before us." Increasingly, however, New York is recognizing its interest in protecting the rich natural resources of the Sound. The Amendments to N.Y.Envtl.Conserv.Law § 13–0329 are rationally related to that interest. Perhaps, "one fine morning—".

Judgment affirmed.

---

**6.** Whether this presumption is unconstitutional is, of course, another question with respect to which we express no opinion.