**UNITED HAULERS ASSOCIATION, INC., Transfer Systems, Inc., Bliss Enterprises, Inc., Ken Wittman Sanitation, Bristol Trash Removal, Levitt's Commercial Containers, Inc., and Ingersoll Pickup, Inc., Plaintiffs–Appellants,**

v.

**ONEIDA–HERKIMER SOLID WASTE MANAGEMENT AUTHORITY, County of Oneida and County of Herkimer, New York, Defendants–Appellees.**

Docket No. 05–2024–CV.

United States Court of Appeals, Second Circuit.

Argued: Dec. 14, 2005.

Decided: Feb. 16, 2006.

Miriam R. Nemetz (Evan M. Tager, on the brief), Mayer, Brown, Rowe & Maw LLP, Washington, D.C. Appearing for Plaintiffs–Appellants.

Michael J. Cahill, Germano & Cahill, P.C., Holbrook, N.Y. (Thomas E. Kelly, Horigan, Horigan, Lombardo & Kelly, P.C., Amsterdam, N.Y.; Richard A. Frye, Frye, Foley & Carbone, Utica, N.Y.; Judy Drabicki, Dexter, N.Y., on the brief) Appearing for Defendants–Appellees.

Caitlin J. Halligan, Solicitor General of the State of New York (Daniel Smirlock, Deputy Solicitor General; Julie M. Loughran, Assistant Solicitor General; and John Sipos, Assistant Attorney General, on the brief), for Eliot Spitzer, Attorney General of the State of New York, New York, N.Y. Appearing for Amicus Curiae State of New York.

Scott M. DuBoff, Wright & Talisman, P.C., Washington, D.C. (Robert Michalik, Michalik Bauer Silvia & Ciccarillo, New Britain, CT; Daniel Guiney, County Attorney of Allegany County, Belmont, NY; Allen Holbrook, Robert Kirtley, Bryan R. Reynolds, Sullivan Mountjoy Stainback & Miller, Owensboro, KY; Scott Norris, Assistant Legal Counsel, Marion County Office of Legal Counsel, Salem, OR; Nicholas Nazdo, Jensen Baird Gardner & Henry, Portland, ME; Mathias H. Heck,

Jr., Montgomery County Prosecuting Attorney, Dayton, OH; Christine M. Chale, Rappaport, Meyers, Whitbeck, Shaw & Rodenhausen, Hudson, NY; Moran M. Pope, III, Pope & Pope, P.A., Hattiesburg, MS; Janice E. Ellis, Prosecuting Attorney, George B. Marsh, Deputy Prosecuting Attorney, Snohomish County, Everett, WA; Harold J. Anderson, Chief Counsel, Solid Waste Authority of Central Ohio, Grove City, OH; Charles H. Younger, Huntsville, AL; Robert M. Strickler, Griffith, Strickler, Lerman & Solymus, York, PA, of counsel) Submitting Brief for Amici Curiae Bristol Resource Recovery Facility Operating Committee; Cape May County Municipal Utilities Authority; County of Allegany, New York; Daviess County, Kentucky; County of Madison, New York; Federation of New York State Solid Waste Associations; Marion County, Oregon; Mid–Maine Waste Management Corporation; Montgomery County, Ohio; Montgomery–Otsego–Schoharie Solid Waste Management Authority; New York Chapter of the Solid Waste Association of North America; New York State Association for Reduction, Reuse and Recycling; New York State Association for Solid Waste Management; Pine Belt Regional Solid Waste Management Authority; Regional Waste Systems, Inc.; Snohomish County, Washington; Solid Waste Authority of Central Ohio; Solid Waste Disposal Authority of the City of Huntsville, Alabama and the York County Solid Waste and Refuse Authority.

Before: CALABRESI, KATZMANN, and WESLEY, Circuit Judges.

KATZMANN, Circuit Judge.

In this case, we are called upon to decide whether a non-discriminatory municipal flow control regulation that does not place non-local firms at a competitive disadvantage, regulate extraterritorially, or conflict with the regulatory requirements of any other jurisdiction nonetheless violates the dormant Commerce Clause. The municipal scheme at issue requires that the garbage generated by local households and businesses be delivered to facilities which are owned and operated by a public corporation, thereby preventing this trash from being processed at non-local facilities. After processing, the trash is then delivered by a private contractor to a designated landfill site, or is reused or recycled. We decline to decide today whether these flow control ordinances impose a cognizable burden on interstate commerce by prohibiting the export of a locally generated article of commerce because we hold that any such burden would not be clearly excessive in relation to the putative local benefits of the flow control scheme. We conclude, therefore, that the challenged local ordinances do not violate the Commerce Clause. Accordingly, we affirm the judgment of the district court.

## I. BACKGROUND

In 1995, Plaintiffs–Appellants United Haulers Association, Inc., Transfer Systems, Inc., Bliss Enterprises, Inc., Ken Wittman Sanitation, Bristol Trash Removal, Levitt's Commercial Containers, Inc. and Ingersoll Pickup, Inc., ("plaintiffs") filed this action pursuant to 42 U.S.C. § 1983 in the Northern District of New York. They claim that ordinances regulating the collection, processing, transfer and disposal of solid waste enacted by the Counties of Oneida and Herkimer violate the dormant aspect of the Commerce Clause and seek injunctive relief barring the enforcement of these ordinances, along with damages and attorneys' fees. Plaintiff United Haulers Association, Inc. is a New York not-for-profit corporation comprised of solid waste management companies. Each of the remaining plaintiffs is a

New York business entity that was a member of the United Haulers Association operating in Oneida and Herkimer Counties at the time this suit was filed.

Defendants–Appellees County of Oneida and County of Herkimer (collectively, "the Counties") enacted the challenged ordinances in 1990. These flow control regulations collectively require all solid wastes and recyclables generated within these adjoining upstate New York counties to be delivered to one of several waste processing facilities owned by Defendant–Appellee Oneida–Herkimer Solid Waste Management Authority ("the Authority"), a municipal corporation.[1] *See* Oneida County Local Law No. 1 of 1990 ("Oneida Law"); Herkimer County Local Law No. 1 of 1990 ("Herkimer Law"). The Authority charges a per-ton "tipping" fee for receiving this waste that is significantly higher than the fees charged on the open market elsewhere in New York State.

The Counties have not excluded private commercial entities from other segments of the local market for waste disposal services. On the contrary, the flow control ordinances expressly allow any licensed private entity, whether local or non-local, to collect solid wastes from area businesses and households for delivery to the Authority's processing facilities. Oneida Law § 10; Herkimer Law § 10. Private commercial entities also are involved in removing wastes from the Authority's facilities after processing. Pursuant to its statutory powers, *see* N.Y. Pub. Auth. L. § 2049–ee(8), the Authority periodically selects a private hauler through an open bidding process to transport processed wastes and recyclables from the Authority's facilities for delivery elsewhere. The Authority awards this delivery contract to the entity deemed to be "the most responsive and responsible Respondent demonstrating the requisite experience and skill in the necessary technologies, and proposing a plan that provides the most cost-effective method of disposing of solid waste with maximum protection of human health and the environment." Expert Report of Robert N. Stavins ¶ 11. Plaintiffs do not contend that in-state firms have any unfair advantage in this bidding process. However, they do note that the Authority's most recent contract has resulted in the shipment of the Counties' waste to a landfill in New York State, and that the Authority is currently in the process of constructing a landfill site to which all of the Counties' landfill-bound processed wastes will be delivered beginning in 2007. *See* Oneida–Herkimer Solid Waste Management Authority, http://www.ohswa.org/landfill/index.html (last visited Feb. 10, 2006). Plaintiffs assert that both of these developments further burden interstate commerce.

Plaintiffs conceded at oral argument that the Counties could create a public monopoly encompassing the entire waste management process, thereby displacing private firms altogether, without violating the Commerce Clause. *See, e.g., USA Recycling, Inc. v. Town of Babylon,* 66 F.3d 1272, 1293–94 (2d Cir.1995). They nonetheless assert that, as long as private entities are permitted to collect garbage from customers, they may not be required to deliver that garbage to an in-state facility, whether publicly or privately owned, as this restriction necessarily prevents them from using processing facilities outside the Counties and thus diminishes the inter-

---

**1.** We described the enactment and operation of the flow control ordinances in comprehensive detail in *United Haulers Association Inc. v. Oneida–Herkimer Solid Waste Management Authority,* 261 F.3d 245, 248–51 (2d Cir. 2001), and therefore do not duplicate that effort here.

state trade in waste and waste disposal services.[2]

The Counties' flow control regime already has been the subject of one appeal to this Court. In the first installment, *United Haulers Association Inc. v. Oneida–Herkimer Solid Waste Management Authority*, 261 F.3d 245 (2d Cir.2001) ("*United Haulers I* "), we reviewed the district court's grant of summary judgment to the plaintiffs. The district court had found that the Counties' flow control ordinances, like those struck down by the Supreme Court in *C & A Carbone v. Town of Clarkstown*, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), discriminate in favor of a single, favored provider, and therefore had examined the ordinances under the heightened standard applied to discriminatory economic regulation. We reversed, holding that because the Counties' flow control ordinances direct solid waste exclusively to facilities owned by the Authority, a public corporation, they do not favor local business interests and therefore are not discriminatory. *United Haulers I*, 261 F.3d at 263. We then remanded the case to the district court for consideration of the ordinances' validity under the more permissive *Pike* balancing test. *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970) (stating that "[w]here [a] statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."). In doing so, we expressed skepticism about the ultimate merits of plaintiffs' challenge, noting that another panel had stated in dicta that "the local interests that are served by consolidating garbage service in the hands of the town-safety, sanitation, reliable garbage service, cheaper service to residents-would in any event outweigh any arguable burdens placed on interstate commerce." *United Haulers I*, 261 F.3d at 263 (quoting *USA Recycling*, 66 F.3d at 1295).

On remand, the parties conducted extensive discovery and then cross-moved for summary judgment. The district court, aided by the thorough Report and Recommendation of Magistrate Judge David E. Peebles, found that the Counties' flow control ordinances are constitutionally permissible. The district court observed that "the challenged laws do not treat similarly situated in-state and out-of-state business interests differently," and found that they therefore do not impose any cognizable burden on interstate commerce. Having reached this conclusion, the district court granted the motion for summary judgment jointly filed by the Counties and the Authority without attempting to assess the local benefits that the ordinances create or to weigh these benefits against the burden placed on interstate commerce.

On appeal, plaintiffs concede, as they did below, that the ordinances afford equal treatment to all commercial entities without regard to their location. However, plaintiffs argue that the district court erred in focusing solely on whether the ordinances inflict disparate harm on non-local businesses. They contend that the district court also should have considered whether the ordinances burden interstate

---

**2.** In *Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Natural Res.*, 504 U.S. 353, 359, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992), the Supreme Court noted that commercial arrangements involving garbage, whether described as "sales of garbage or purchases of transportation and disposal services," constitute commercial transactions in articles of commerce that have an interstate character (quotation marks omitted). We use these descriptions interchangeably throughout.

commerce by accomplishing directly what the regulatory burdens found suspect by courts in other contexts do indirectly—*i.e.*, prevent goods and services from flowing across internal political boundaries.

In response, the Counties, the Authority, and the State of New York, appearing as *amicus curiae*, reject plaintiffs' contention that the flow control ordinances burden interstate commerce in any cognizable respect, given plaintiffs' concessions that the ordinances do not disparately impact non-local businesses or interfere with the regulatory regimes of other localities or states. In the alternative, they suggest that the environmental and public health benefits attributable to the ordinances far outweigh any incidental burden on interstate commerce that the ordinances might be found to impose.

## II. STANDARD OF REVIEW

We review *de novo* a district court's grant of summary judgment in favor of defendants. *Ford v. McGinnis*, 352 F.3d 582, 587 (2d Cir.2003). In doing so, we focus on whether the district court properly concluded that there was no genuine issue as to any material fact and that the defendants were entitled to judgment as a matter of law, drawing all necessary factual inferences in favor of the plaintiffs. *Id.*

## III. DISCUSSION

Plaintiffs' claim fails because even assuming, *arguendo*, that a burden on interstate commerce exists, it is far exceeded by the ordinances' local benefits. That is, even if we were to agree with plaintiffs that the Counties' flow control ordinances impose a cognizable burden on interstate commerce by preventing the waste generated within the Counties from being exported for processing, given the Counties' undoubted power to monopolize the local marketplace in waste disposal services, as

well as the Counties' substantial interest in regulating waste disposal, we also would conclude that the Commerce Clause does not require us to invalidate these ordinances.

### A.

■ Where a challenged state or local regulation does not entail "patent discrimination" against interstate commerce, we assess its validity under the *Pike* standard. *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). Under *Pike*, a challenged regulation will be upheld unless it "places a burden on interstate commerce that is clearly excessive in relation to the putative local benefits." *USA Recycling*, 66 F.3d at 1282 (internal quotation marks omitted). As we have repeatedly emphasized, "[f]or a state statute to run afoul of the *Pike* standard, the statute, at a minimum, must impose a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce." *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 109 (2d Cir.2001) ("*NEMA*") (citing, *inter alia*, *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59, 75 (2d Cir. 1998); *Gary D. Peake Excavating Inc. v. Town Bd. of Hancock*, 93 F.3d 68, 75 (2d Cir.1996); *N.Y. State Trawlers Ass'n v. Jorling*, 16 F.3d 1303, 1308 (2d Cir.1994); *USA Recycling*, 66 F.3d at 1287). To this point, we have recognized three instances in which a non-discriminatory state or local regulation may impose a differential burden on interstate commerce: (1) when the regulation has a disparate impact on any non-local commercial entity; (2) when the statute regulates commercial activity that takes place wholly beyond the state's borders; and (3) when the challenged statute imposes a regulatory requirement incon-

sistent with those of other states. *See id.* at 109–10.

As noted above, plaintiffs concede that the challenged ordinances do not confer any economic advantage on any private entity. They likewise have not argued that the ordinances—which apply only to waste generated in Oneida and Herkimer Counties—conflict in any respect with the regulatory requirements imposed by any other jurisdiction, or that they regulate conduct occurring outside the Counties. Plaintiffs thus, by their own admission, have failed to allege that the Counties' regulations have any effect that we have previously recognized as imposing a differential burden on interstate commerce. If we limited ourselves to this inquiry, as the district court did, and as the Defendants–Appellees and New York State would have us do, we could swiftly affirm the decision of the district court that the flow control ordinances do not burden interstate commerce in any cognizable way.

**B.**

Undaunted, plaintiffs correctly note we have never held that the above list of recognized differential burdens is a closed set. *See NEMA,* 272 F.3d at 109–110 (stating that "several types of burdens would qualify as disparate to trigger *Pike* balancing," and identifying regulatory conflicts and extraterritorial effect as two of them) (internal quotation marks omitted). *See also Pac. N.W. Venison Prods. v. Smitch,* 20 F.3d 1008, 1015 (9th Cir.1994) (noting the set of cognizable burdens on interstate commerce "include[s]" a lack of uniformity in state laws, extraterritorial regulation, and disparate impact on non-local interests). They therefore propose two novel ways in which the Counties' ordinances might be seen to burden interstate commerce. First, they contend that interstate commerce is differentially bur-

dened when the Authority arranges for the delivery of the Counties' processed wastes to an in-state disposal site. Second, they suggest that the ordinances burden interstate commerce by creating a public monopoly in the processing of locally generated solid waste, thereby prohibiting private entities from exporting unprocessed trash and recyclables to other states. We address these arguments in turn.

**1. The Authority's Delivery Contracts**

We easily dispose of plaintiffs' claim that the Counties' exclusive contracts with private commercial entities for the removal and disposal of waste processed at the Authority's facilities impose a burden on interstate commerce because "[w]hen the Authority selects an in-state disposal site for its non-recyclable waste, *ipso facto* interstate transportation of that waste stream ceases during the term of the contract." Br. of Pls.-Appellants 28. This argument fails because it ignores the well-established distinction between a state's actions in regulating commercial activity, which are limited by the dormant Commerce Clause, and its actions as a participant in the marketplace, which are not. *See Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 810, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976) ("Nothing in the purposes animating the Commerce Clause prohibits a State, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others.") (footnote omitted).

A governmental entity acts as a market regulator when it employs tools in pursuit of compliance that no private actor could wield, such as the threat of civil fines, criminal fines and incarceration. *SSC Corp. v. Town of Smithtown,* 66 F.3d 502, 512 (2d Cir.1995). If, on the other hand, "the state is buying or selling goods

as any private economic actor might, then it is engaging in market participation that by definition falls outside the scope of activity governed by the dormant Commerce Clause." *USA Recycling*, 66 F.3d at 1281 (quotation marks omitted). Moreover, it is well settled that a state may act as a market participant with respect to one portion of a program while operating as a market regulator in implementing another. Accordingly, "[c]ourts must evaluate separately each challenged activity of the state to determine whether it constitutes participation or regulation." *Id.* at 1283.

It is plain that the Authority participates in the marketplace as any other economic actor would when, after having employed its regulatory powers to compel delivery of the waste generated within the Counties to its processing facilities, it contracts with private parties to deliver its processed wastes to landfill sites that meet its requirements. Indeed, plaintiffs' very complaint is that the Counties' ordinances prevent them from doing business with out-of-state firms that would process and dispose of the waste they collect in much the same way that the Authority does. Because the Authority in entering into such contracts does not employ any uniquely governmental power or regulate any part of the market in which it is not a participant, the outcome of its bidding process simply is not a concern of the Commerce Clause. *Smithtown*, 66 F.3d at 514–17 (holding that a municipality may require a hauler with which it contracts to deliver waste to a particular disposal site).

■ We likewise reject plaintiffs' claim that interstate commerce will be burdened when, upon the completion of a landfill site operated by the Authority, the Authority directs the Counties' wastes to this local site. Unquestionably, a governmental entity may refrain from selling into the marketplace articles of commerce that lawfully have come into its possession. In doing so, it does not regulate commerce, and thus is not limited by the Commerce Clause. Moreover, even if the Authority ultimately hires private haulers to move the waste from one government-owned facility to another, it would still enter the market as a participant, not a regulator, and therefore would be free to operate in this vein free of limitations imposed by the Commerce Clause. *See id.*.

This distinction between market participation and market regulation also brings into sharp relief the real issue raised by this appeal. Since the Commerce Clause does not restrict the Authority's choices about how to dispose of the trash that it has lawfully collected, the question truly presented is whether the Counties in fact act lawfully in using their governmental powers to gain possession of all locally generated solid waste, or whether they violate the Commerce Clause in doing so.

## 2. The Export Barrier Effect

■ The Counties' flow control regulations mandate that all commercial and industrial waste collected by either municipal or private haulers "shall be delivered to the appropriate facility." Oneida Law § 6(a); Herkimer Law § 6(a). The same requirement applies to recyclables. Oneida Law § 6(b); Herkimer Law § 6(b). A person or entity who violates these rules may be subjected to civil or criminal penalties. Oneida Law § 12; Herkimer Law § 13. By requiring all locally generated wastes to be processed at the Authority's facilities, these regulations necessarily prevent this waste from being processed elsewhere, and therefore impose a type of export barrier on the Counties' unprocessed wastes. As to this much, the parties agree. They also agree that the regulations restrict all private entities equally, do not threaten to conflict with the regula-

tions of other jurisdictions, and do not regulate extraterritorial conduct. The question is whether this non-discriminatory regulatory scheme nonetheless imposes a cognizable burden on interstate commerce because it has the direct and clearly intended effect of prohibiting articles of commerce generated within the Counties from crossing intrastate and interstate lines. If we are persuaded that it does, we must augment the list of regulatory effects that we have viewed as imposing a differential burden on interstate commerce.

■ The federal courts long have recognized that a primary purpose of the Commerce Clause is to prevent the unitary national economic unit envisioned by the Framers from being disrupted by local tax and regulatory barriers to trade. *See, e.g., Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 527, 55 S.Ct. 497, 79 L.Ed. 1032 (1935) (declaring that "one state in its dealings with another may not place itself in a position of economic isolation"). This conception has found its most famous expression in the oft-quoted words of Justice Jackson, who explained:

> Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his export, and no foreign state will by customs duties or regulations exclude them. Likewise, every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any. Such was the vision of the Founders; such has been the doctrine of this Court which has given it reality.

*H.P. Hood & Sons, Inc. v. Du Mond,* 336 U.S. 525, 539, 69 S.Ct. 657, 93 L.Ed. 865 (1949).

In recognition of this intent, the courts have closely examined state and local regulations that prohibit the import or export of traded goods and thereby disadvantage some commercial entities in their competition with others, subjecting these statutes to exacting scrutiny which few have been able to withstand. *See, e.g., Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Natural Res.,* 504 U.S. 353, 367–68, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992) (invalidating Michigan ordinance preventing private landfill owners from accepting unauthorized solid waste that originated outside the county); *City of Philadelphia,* 437 U.S. at 628, 98 S.Ct. 2531 (striking down New Jersey statute barring the importation of most hazardous wastes from other states); *Dean Milk Co. v. Madison,* 340 U.S. 349, 354, 71 S.Ct. 295, 95 L.Ed. 329 (1951) (invalidating local ordinance prohibiting distributors from selling milk labeled as pasteurized unless it had been treated within five miles of Madison's central square); *Pennsylvania v. West Virginia,* 262 U.S. 553, 599–600, 43 S.Ct. 658, 67 L.Ed. 1117 (1923) (invalidating West Virginia statute barring export of natural gas until in-state demand had been satisfied); *West v. Kansas Natural Gas Co.,* 221 U.S. 229, 262, 31 S.Ct. 564, 55 L.Ed. 716 (1911) (striking down Oklahoma statute prohibiting export of natural gas). *But see Maine v. Taylor,* 477 U.S. 131, 151–52, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986) (upholding Maine ban on the importation of baitfish that was intended to protect local fisheries from the introduction of parasites and non-native species).

■ As we held in *United Haulers I,* and as we reaffirm today, the Counties' flow control ordinances do not discriminate against interstate commerce because no private entity, whether local or non-local, has been disadvantaged vis-à-vis any other by the creation of the Authority's monopo-

ly in waste processing. However, that conclusion does not blind us to the fact that the Counties' flow control ordinances have removed the waste generated in Oneida and Herkimer Counties from the national marketplace for waste processing services, a result which traditionally has been thought to implicate a central purpose of the Commerce Clause. Considered against this historical backdrop, there may be some force to plaintiffs' claim that the narrow class of regulations that explicitly create a prohibitory barrier to commerce for the benefit of a governmental entity operating in an area of traditional governmental concern, even if non-discriminatory, impose some differential burden on interstate commerce which should be examined under the *Pike* test.

On the other hand, that force is blunted considerably by the absence of any suggestion that these ordinances have any practical effect other than to raise the costs of performing waste collection services within the Counties, and thus the prices paid by local consumers of those services. The purported differential burden does not appear to fall differentially on the shoulders of any identifiable private or governmental entity; rather, it is alleged to affect differentially the indefinite web of commercial transactions that makes up interstate commerce. But, as we have previously explained, while every state and local regulation imposes costs on merchants who do business there, "[t]he focus of our disparate burden analysis is a state's shifting the costs of regulation to other states. Such circumstances raise the risk that state policymakers will not bear the true political costs of their decisions, because those costs will fall in some measure on the residents of other political jurisdictions." *NEMA,* 272 F.3d at 109 (internal citations omitted). The plaintiffs have not suggested that the Counties' ordinances shift the costs of waste disposal regulation to other jurisdictions by virtue of the fact that they create a regulatory barrier to the export of unprocessed trash. Our precedents in this area would thus appear to counsel against the recognition of the rather abstract harm identified by the plaintiffs as a differential burden triggering the need for *Pike* analysis.

We decline to resolve this question today, however. We do so because, as we explain in the following section, we find it readily apparent that, even if we were to endorse the plaintiffs' claim that the Counties' ordinances burden interstate commerce by preventing the Counties' wastes from being processed by non-local facilities, the resulting burden would be substantially outweighed by the ordinances' local benefits.

### C. Application of the *Pike* Balancing Test

As noted above, even if we found that the Counties' flow control ordinances impose a cognizable burden on interstate commerce, we then would turn to the ultimate question of whether this burden is one which the Commerce Clause will tolerate. In our view, any arguable burden imposed on interstate commerce by the challenged flow control ordinances, far from being "clearly excessive" in relation to the local benefits they confer, is modest. The ordinances' benefits, on the other hand, are clear and substantial. We therefore conclude, without deciding whether the ordinances impose any burden on interstate commerce, that the Counties' ordinances do not violate the dormant Commerce Clause.

As we discussed in the previous section, the challenged ordinances arguably burden interstate commerce by prohibiting the export of unprocessed solid waste and recyclables. In deciding what weight to ascribe

to this purported burden, we take note of our prior holding that a municipality, consistent with the Commerce Clause, may impose a public monopoly encompassing the activities of waste collection, processing and disposal. *USA Recycling*, 66 F.3d at 1293–94. If a municipal government may *eliminate* the local private market for waste disposal services, we think it necessarily follows that a local government imposes no more than a limited burden on interstate commerce when it creates a partial monopoly with respect to solid waste management—here, at the processing stage—that has the ancillary effect of diminishing interstate commerce in that same market.

Plaintiffs' argument that economic "balkanization" would result if jurisdictions across the country were to adopt a similar flow control scheme fails for similar reasons. It is unquestionably the case that the interstate market for waste disposal services would suffer if numerous jurisdictions were to impose restrictions like these on private entities that engage in trash collection. But it is difficult to muster much alarm about that result when, for at least one hundred years, this nation has allowed municipalities to exercise the greater power of taking exclusive control of all locally generated solid waste from the moment that it is placed on the curb. *See, e.g., Gardner v. Michigan*, 199 U.S. 325, 26 S.Ct. 106, 50 L.Ed. 212 (1905) and *Cal. Reduction Co. v. Sanitary Reduction Works*, 199 U.S. 306, 26 S.Ct. 100, 50 L.Ed. 204 (1905).

▆▆▆ The absence of any suggestion that the ordinances have a protectionist effect, or that they interfere with the authority of any other jurisdiction to decide whether and how to regulate its own local waste management concerns, also persuades us that any arguable burden imposed on interstate commerce by the ordinances is easily tolerated. While we have presumed for present purposes that the absence of these effects is not determinative of whether the ordinances create *any* cognizable burden, these factors remain critical to our consideration of the *degree* to which they might burden interstate commerce. This is so because we think the courts have safeguarded the ability of commercial goods to cross state lines primarily as a means to protect the right of businesses to compete on an equal footing wherever they choose to operate, *see H.P. Hood & Sons*, 336 U.S. at 539, 69 S.Ct. 657 ("Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation ...."), and of states and municipalities to exercise their police powers without undue interference from the laws of neighboring jurisdictions, *see Healy v. Beer Inst.*, 491 U.S. 324, 336–37, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989) ("[T]he Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State."). Where neither of these underlying purposes is implicated by a particular legislative enactment, the burden imposed on interstate commerce must be regarded as insubstantial.

▆▆▆ Our conclusion that the assumed burden created by the challenged ordinances is slight means that the defendants need to present only a minimal showing of local benefit in order to compel a finding that this burden is not "clearly excessive" to the benefits that the ordinances provide. The Counties' flow control regulations easily clear this hurdle. First, the flow control measures secure the financial viability of the Counties' comprehensive waste management program by ensuring that sufficient waste (with its attendant "tipping"

fees) is delivered to the Authority's facilities. We readily acknowledge that "revenue generation is not a local interest that can justify discrimination against interstate commerce." *Carbone,* 511 U.S. at 393, 114 S.Ct. 1677. However, we are not persuaded by the plaintiffs' suggestion that revenue generation likewise is an insufficient justification to support a *non-discriminatory* regulation, given that the Supreme Court has held in other contexts that a rationale which is insufficient to justify a discriminatory law often is capable of supporting a non-discriminatory statute. *Compare Harper v. Va. Bd. of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (striking down poll tax and declining to adopt dissent's suggestion that the poll tax was adequately supported by the State's interest in collecting revenue) *with M.L.B. v. S.L.J.,* 519 U.S. 102, 123, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996) (noting that a "State's need for revenue to offset costs, in the mine run of cases, satisfies the rationality requirement" in Equal Protection and Due Process analyses). *But see Carbone,* 511 U.S. at 405–06, 114 S.Ct. 1677 (O'Connor, *J.,* concurring) (finding financing rationale insufficient under *Pike* where the municipality could have employed other means to raise necessary revenue).[3] Moreover, the flow control requirement allows the Counties to distribute the costs associated with operating its waste management system in a manner commensurate with the extent that local individuals and businesses place demands on those facilities, and to do so in an administratively convenient way.

The record also demonstrates that financing is not the sole purpose of the flow control ordinances. Rather, the flow control measures substantially facilitate the Counties' goal of establishing a comprehensive waste management system that encourages waste volume reduction, recycling, and reuse and ensures the proper disposal of hazardous wastes, thereby reducing the Counties' exposure to costly environmental tort suits. *See B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1198 (2d Cir.1992) (holding that "a municipality may be liable as a potentially responsible party if it arranges for the disposal of hazardous substances"). Requiring that all solid waste be delivered to an appropriate processing facility allows the Authority to pursue these goals by establishing differential pricing for different categories of waste, assessing fines for non-compliance, and directing the region's trash to landfill facilities that employ acceptable environmental practices. We agree with plaintiffs that some of these goals, particularly those relating to revenue generation, also might be achieved through other instruments of municipal policy. However, nothing in the record before us demonstrates, or even suggests, that the Counties could address their liability concerns or encourage recycling across the wide range of waste products accepted by the Authority's recycling

3. In light of the plaintiffs' heavy reliance on Justice O'Connor's concurring opinion in *Carbone,* we note that no other Justice joined this opinion or otherwise agreed with Justice O'Connor's analysis. The other five justices who voted to strike down the ordinance did so on the basis that the town's ordinance discriminated against interstate commerce. *Carbone,* 511 U.S. at 391–92, 114 S.Ct. 1677. Justice O'Connor disagreed that the discrimination test was applicable, but thought that the flow control measures failed the *Pike* test because the burden placed on interstate commerce was excessive. *Id.* at 405–07, 114 S.Ct. 1677. The three dissenting justices also disagreed with the majority's assessment, but, unlike Justice O'Connor, opined that the benefits of the ordinances outweighed any incidental burden on interstate commerce. *Id.* at 423–30, 114 S.Ct. 1677. (Souter, *J.,* dissenting). In particular, the dissenters emphasized that "[p]rotection of the public fisc is a legitimate local benefit directly advanced by the ordinance." *Id.* at 429, 114 S.Ct. 1677.

program in any other way, let alone through an approach as straightforward as the use of flow control.

In our view, then, the local benefits of the flow control measures substantially outweigh whatever modest differential burden they may place on interstate commerce. Because the *Pike* test places the onus on the plaintiffs to show that this burden is clearly excessive in relation to these benefits, we easily find that the Counties' flow control ordinances do not violate the dormant Commerce Clause, and therefore do not decide whether the ordinances burden interstate commerce at all.

## IV. CONCLUSION

We have considered all of plaintiffs' other arguments and find them to be without merit. For the reasons set forth above, the district court correctly granted summary judgment to the Defendants–Appellees. Accordingly, the judgment of the district court is hereby **AFFIRMED**.